PEOPLE v. PAGE.

1. CRIMINAL LAW—MURDER—INDICTMENT AND INFORMATION—SUF-
FICIENCY.

An information for murder in the form of the statute, 3 Comp. Laws 1915, § 15739, is sufficient, although it does not state that the murder was committed while a robbery was being perpetrated or attempted.[1]

2. SAME—MURDER IN FIRST DEGREE—STATUTES.

Under 3 Comp. Laws 1915, § 15192, the killing of a human being, which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery or burglary, constitutes murder in the first degree.

3. TRIAL—ALIBI—INSTRUCTIONS—REQUESTS TO CHARGE.

Any error on the part of the trial court in a murder case in failing to give an instruction on the right to find the defendant guilty of manslaughter is untenable, where the case is tried on the theory of the State of murder while attempting to rob, and the defense is an alibi, and no instruction that defendant might under the information be found guilty of manslaughter is requested.

[1]On effect of statutory declaration that murder committed by certain means, or in the commission of felony, shall be murder in the first degree, upon right of jury to pass upon degree, see notes in 12 L. R. A. (N. S.) 935, L. R. A. 1916D, 610.

On reversal of conviction because of unfair or irrelevant arguments or statements of facts by prosecuting attorney, see note in 46 L. R. A. 641, specifically as to reference to previous conviction or other crimes, see page 663 of above note.

Generally on the question of homicide in the commission of felonies, see note in 63 L. R. A. 354.

4. SAME—ADMISSIONS—INSTRUCTIONS—PREJUDICIAL ERROR.

　　The admission, in a criminal prosecution for murder, of evidence of former crimes of accused will not be presumed to be prejudicial error where the court grants a motion to strike out such testimony and the jury at once is instructed to disregard it, and the instruction is also stated in the general charge.

5. SAME—CONDUCT OF COUNSEL—APPEAL AND ERROR.

　　An objection to the conduct of counsel for the State in attempting to introduce incompetent evidence in a criminal case must be specific in order to constitute a basis for the assignment of error.

6. SAME — INCOMPETENT TESTIMONY — INSTRUCTIONS — HARMLESS ERROR.

　　The attempt of the State, in a criminal prosecution for murder, to introduce incompetent testimony is harmless error where the court promptly rules that it would not be competent and the jury is cautioned to pay no attention to it.

Error to the superior court of Grand Rapids; Dunham, J. Submitted April 12, 1917. (Docket No. 157.) Decided December 27, 1917.

Lawrence Page was convicted of murder in the first degree, and sentenced to imprisonment for life in the branch of the State prison at Marquette. Affirmed.

*Louis T. Herman,* for appellant.

*Cornelius Hoffius,* Prosecuting Attorney, and *Fred P. Geib,* Assistant Prosecuting Attorney, for the people.

STEERE, J. Respondent, Lawrence Page, a young man 22 years of age, was convicted in the superior court of the city of Grand Rapids in Kent county of the murder of his stepgrandfather, Francis M. Sprague, who at the time of his death was living alone at 425 Rosell avenue in the westerly outskirts of said city.

Respondent was arraigned in the superior court on April 22, 1916, under an information containing three counts charging him in varying language with the murder of Sprague, on January 18, 1916. He stood mute to the information, and a plea of not guilty was entered by the court in his behalf. The case was brought to trial before a jury on June 6, 1916. The theory and claim of the prosecution was that respondent killed Sprague while robbing or attempting to rob him when they were alone together in the latter's home at or about 4 o'clock in the afternoon of January 18, 1916. Sprague's death was not discovered until shortly after noon on January 20, 1916, when his dead body was found in his home in a condition indicating conclusively that he had suffered death by violence a considerable time before the fact was known, and the *corpus delicti* is not questioned. The prosecution could produce no witnesses to the tragedy, and its evidence against respondent was circumstantial. The defense was an alibi. The trial lasted until June 16, 1916, when the case was submitted to the jury and a verdict rendered finding defendant guilty of murder in the first degree, for which he was subsequently sentenced to confinement in the branch State prison at Marquette for life.

Respondent's numerous assignments of error concentrate, in substance, to the four claims of prejudicial conduct and remarks of the prosecuting attorney during the introduction of testimony and in summing up the case, a fatal variance between the proof of the prosecution and its information, prejudicial admission by the court of incompetent testimony not cured by subsequently striking it out, and failure of the court to instruct the jury that respondent might be found guilty of a lesser crime than murder in the first degree.

Francis Sprague was 78 years of age at the time of his death. He was the husband of respondent's grandmother, with whom he had lived for several years in rooms on the second story of the house where he was living alone at the time he met his death; but under an agreement of separation between them, dated November 30, 1915, she had gone elsewhere to reside, leaving him in occupation of the rooms they formerly occupied together. The place belonged to her, and at the time in question her goods were stored in the lower part of the house, which was otherwise not in use and locked up; access to the rooms upstairs in which he lived being by an outside iron stairway at the rear of the building. Rosell avenue, which runs northerly and southerly in the westerly part of the city, is most directly reached from the central or business section by Bridge street, which runs east and west with a car line extending along it from Monroe avenue to the west, past Lincoln Park, to Valley avenue. Rosell is the next street west beyond Valley avenue, on higher ground and beyond the end of the car line. It is not a graded street and runs north from Bridge under the slope or near the rise of a height called Bridge Street Hill. Turning north upon it from Bridge street there are no buildings on the right or easterly side of Rosell avenue. On the left or westerly side, the first house is the home of an old couple named Weiner, beyond which, with a vacant lot or two between, is the house in which Sprague lived; just north and close adjacent to which is a house occupied by a family named De Graff, directly opposite whose kitchen door and within six or eight feet rests the foot of the outside stairs at the rear of the Sprague house. The hill rises sharply from the street to the west at the rear of the houses, which are on a so-called terrace considerably above the street level with a rise and walk leading to the rear between the two houses. Sprague was accustomed to

receive mail in the De Graff mail box, which was on their porch. The upstairs portion of the house which he occupied consisted of two rooms, a front room facing east on Rosell avenue and a back room facing west used for kitchen purposes, connected by a door and small covered landing with the head of the outside stairway. Respondent was familiar with the place and its environments, as well as Sprague's habits and characteristics, having both visited and lived there at different times. He testified on direct examination that before he went to Ionia prison he had lived up there with his grandmother and Sprague "six months in a stretch."

Shortly after 12 o'clock on January 20, 1916, one Edward F. Lillie, who had known Sprague for "35 or 40 years," went to his place of residence, passing to the rear between the Sprague and De Graff houses. It had been snowing, and he noticed there were no tracks. On going up the outside stairs he found a key in the lock of the outside door. He opened the door and saw deceased lying upon the floor apparently dead and in such condition that, without stopping to investigate, he hurried to a drug store at the corner of Valley and Bridge streets, where he telephoned the police department and for a coroner. A police officer named Slater was first on the scene, followed soon by the coroner and others. They found Sprague lying dead on the floor on his back in the rear room next to the entrance from the outside stairway, fully dressed as though he had just been or was going outside, having on his rubbers and a fur-lined overcoat. There was a partition on the south side of this room with a table against it not far from the outer door, upon which were dishes, articles of food, and a hammer with a drop of blood upon it. The body and room were cold. Some water in a pail near the outer door was frozen, and Sprague's body lay with the head to the southwest towards the

table in a frozen pool of blood, with the feet to the northeast within three or four feet of the entrance way between the two rooms across which a curtain hung on a rod. Against the wall close to this curtained doorway stood an iron bar about 20 inches long, two inches wide and an inch thick. On the right of the body close to this doorway was a pool of blood in which was frozen the handle of a potato masher. Near it was a pair of bow spectacles and his broken false teeth. The hands lay at his sides with the palms turned up. His tie was disarranged, collar broken in front, with blood on his shirt, collar, overcoat, and the back of his hands. The lapels of his coat were open with a bank book and other papers of no general value resting upon them, and a Grand Rapids Herald dated January 18th lay partially across the body. There was no money, watch, chain, stick pin, or other jewelry upon the body, except a plain band ring on his finger, and no weapon of any kind. A cap lay on the floor in the front room with blood stains and hair on the inside. A screwdriver lay on the floor between the body and outer door. Various serious cuts and bruises appeared upon the face and head. The autopsy disclosed a cut about an inch long under the left eye, another about two inches long on the forehead extending back with a clean cut wound to the skull, a jagged, crushing wound on the side of the head above the ear, and a fracture of the temporal bone where the lower jaw fits into it. The coroner testified that the organs were normal and death had resulted from this fracture of the skull producing concussion of the brain.

Officers of the police department immediately began an investigation, and detectives were detailed upon the case. The De Graffs and Weiners, who lived next adjacent on each side of the Sprague house, were interviewed at once. An officer went that afternoon

to look for respondent and an associate named Vincent Jagge. He visited their homes without finding them, but later, while waiting on the street, saw them come out of a pool room together and arrested them. They were taken to jail and put in separate cells. Each at first made total denial of any knowledge of or participation in the offense under investigation, but a couple of days later Jagge made a statement to the officers of his knowledge in relation to the matter, implicating respondent. As shown by the testimony of each of them, respondent and Jagge had been associates of like tastes and habits, pursuing their pleasures and vices in familiar companionship. Both were young men averse to steady employment, apparently preferring to live upon indulgent parents or relatives and obtain funds by borrowing, pawning their clothing, and other questionable expedients, rather than by working. Near three years prior to this time respondent had forged Sprague's name to a check, and Jagge had passed it. When arraigned for that offense, they pleaded guilty and were paroled by the court under suspended sentence. Respondent violated his parole and was sentenced to Ionia prison, where he served time until paroled from there in November, 1915, when he returned to his home in Grand Rapids and went to work in a factory where employment had been secured for him, but started again to frequent saloons, before he had seen Jagge or any of his old associates, as he testified, soon left his employment, and renewed his companionship with Jagge and other kindred spirits. He visited Sprague on several occasions and attempted to borrow money of him, states that he played checkers with him, was there in November to "get money for my tools," and secured $10. Jagge, who knew of respondent visiting Sprague to borrow money, testified that he reported lack of success on such occasions.

The last time Sprague was shown to have been seen
alive by any one was on Tuesday, January 18, 1916,
the date of the newspaper found with his body.  He
was shown to have gone downtown that afternoon and
returned about 4 o'clock.  Mrs. De Graff and Marga-
ret Exo, who was living with her, saw him come up the
steps to their porch that day and get his mail from
the box about 4 o'clock p. m.  He then had on an over-
coat with a fur collar.  August Weiner and wife, who
lived on the south side of the Sprague residence and
had known Sprague for several years, saw him, on the
afternoon of the Tuesday before his body was found,
as he passed their house going to and returning from
the car line wearing a dark overcoat and cap.  Weiner
testified he was 72 years of age and did not work win-
ters; that while sitting by his window on that after-
noon he saw respondent, whom he had known well by
sight since 1905, pass northerly from the street car
line towards Sprague's place without any overcoat on
and walking fast; that he was curious to observe where
he went, and watched him turn into the passageway
between the two houses leading to Sprague's stair;
that witness remained by the window, and about half
an hour later saw Sprague go by towards his home.
Mrs. Weiner also testified to seeing respondent pass
their house.  In confirmation of the date, Weiner tes-
tified on cross-examination that he first told of this to
the officer on the Thursday following, when they found
the body and the ambulance was there.  Minnie Bed-
ford, proprietress of the Charlevoix Hotel on Monroe
avenue, knew Sprague, who was often at her place
and received mail there, recalled seeing him there the
last time between 1 and 2 o'clock on the Tuesday pre-
vious to his body being found.  Edward Mead, conduct-
or of the car on which Sprague rode home that Tues-
day, remembered the occasion and his speaking about
a pair of glasses he thought he had lost and asked

Mead to look for, stating he had himself mislaid and found them. None of these witnesses or any others who testified had seen Sprague after that day until the body was found. Persons well acquainted with Sprague testified that he was in the habit of carrying considerable money on his person. As before stated, respondent knew Sprague well, and Jagge testified he told him of this habit.

It was shown that on Monday evening before the Tuesday in question respondent pawned his overcoat, which was of a dark gray color, to a Mr. Pawlowski for $2, although it was then cold winter weather. Pawlowski testified that he saw respondent the next afternoon (Tuesday) at about 5 o'clock in front of the Pantlind Hotel wearing a brown overcoat and spoke to him but received no response. Respondent redeemed his gray overcoat that day. He testified that he borrowed the money to do so from his mother, whom he met when he was on his way to see his grandmother, from whom he expected to get it. On Wednesday he went to Ionia, as he stated, to see the pardon board about getting permission to go to Detroit for work. He returned to Grand Rapids that night. Of respondent's visit to Sprague's house on that Tuesday Jagge testified, in part, that they met at the Columbia Hotel about 11 a. m., where they remained drinking and playing cards until about 2:30, when they left together; that although it was a cold day neither had an overcoat, Jagge having sold his some time before, while respondent had pawned his the previous evening; that neither had any money to speak of, and respondent said he was going to his grandfather's to get some, and Jagge asked him how he could get it, to which he replied, "Leave it to me, I will get it;" that they walked together west on Bridge street to the vicinity of Lincoln Park, and respondent asked Jagge if he would wait for him, to which Jagge said he

would go to his grandmother's on Garfield street, which was near by, and wait there; that he did so, and got something to eat, after which he went out to look for respondent and, not seeing him, returned to his grandmother's, where he read for a while and about 4 o'clock went out, saw respondent with a brown overcoat on extending below his knees and his hands in the pockets; that as they met respondent "acted kind of scared," and with an oath said, "Look there!" showing his left hand with some blood upon it, and, when asked what happened, said that Sprague came home and finding him there addressed him roughly, and in reply to his request to borrow money called him a vile name, looking around for something to strike him with, whereupon respondent "knocked him cold;" that after they went down the street a distance he produced a watch, with chain, and diamond, and said he also got a bunch of checks; that they went to Lincoln Park together, where respondent showed some blood on his knee and tried to wash the blood from his hands at the pump in the park, but it was frozen up; that he wanted Jagge to pawn the diamond he had, but the latter told him he was going home to steal something and left him; that he later met respondent down town wearing the same brown overcoat, and they were together for a time, then respondent went to a pawnshop while Jagge went to a theater and looked at pictures in the lobby, after which they met and respondent said he had tried to pawn the diamond but could not get enough money on it; that they met by chance the next day, and respondent said his "mother burned everything up, the suit and the overcoat and the underwear, and she had ditched the diamond, and he had found the diamond and taken out the real stone and put in a piece of glass and he had the real diamond with him that day, and he wanted me to find some one to pawn the diamond for him. He said he would give

them half the money if I could find somebody for him. I told him I didn't know of anybody."

Jagge's grandmother, Mrs. Garbrecht, testified that on the Tuesday in question he came to her home and remained about three-quarters of an hour and had something to eat; that he went out once during that time, and when he finally left she watched him from the window and saw him meet a boy whom she identified as respondent, who had on an overcoat, and she saw him pull his hand out of his pocket, showing it to Jagge, when they walked away together towards Bridge street. A young woman named Della Tischer, who worked in Peck's drug store and roomed at the Page home, testified that she usually got home before 7, and on the evening of January 18th she could not get into the house as usual; that she knocked, and finally respondent came to the door and asked, "Is that you, Della?" upon receiving an affirmative reply, he opened the door, and she noticed that he was excited; that in the sitting room one window was open as far as it would go, and there was a quick fire in the stove with an odor of burning cloth in the room.

Jagge's long and grilling cross-examination, as well as portions of his direct examination, showed him, as claimed by the defense, a witness of unsavory character, limited intelligence, and questionable veracity. His memory did not always serve him well as to what he had recently testified to. He was palpably of that type of witnesses the chief value of whose story lies in confirmatory facts and circumstances by credible witnesses to the discovery of which it has led. Though varying in minor details, his story and that of respondent touching their personal relations, conduct, and circumstances during the time under inquiry only differ materially as to respondent's whereabouts on the afternoon of January 18th and what was done or said by him in relation to his connection with or knowledge

of Sprague's death. He made total denial of seeing or being with Jagge that afternoon, and in support of his claimed alibi gave practically unsupported testimony as to his whereabouts between 2 o'clock and 5, although he stated a portion of the afternoon was spent at home fixing his mother's washing machine and changing the socket of the electric light in Miss Tischer's room from a snap to a pull switch. She denied that the light had been changed that day, and no member of his family testified to his being at home during that time. Many witnesses were called and testified to facts and circumstances tending to sustain or refute the theory of the defense, and, without further detail, it is sufficient to state that the record furnishes abundance of testimony which if found true fully supports the verdict rendered.

Defendant's complaint of prejudicial variance between the information and proofs, because none of the counts charged in direct words that the murder was committed while a robbery was being perpetrated or attempted, is not well founded. One of the counts was the statutory short form and the others of like import, but more elaborate phraseology. There was nothing in them to mislead. They simply failed to fully set out the manner in which the charged murder was claimed to have been committed and means used. It is not necessary in an information, or indictment, in this State

"to set forth the manner in which, or the means by which the death of the deceased was caused; but it shall be sufficient in any indictment (or information) for murder to charge that the defendant did wilfully, and, of his malice aforethought kill and murder the deceased." 3 Comp. Laws 1915, § 15739.

That was done in this case. Respondent's arrest on suspicion was followed by a complaint, warrant, and lengthy preliminary examination before the commit-

ting magistrate, or police court; while the testimony then taken is not in the printed record, it was returned to and before the trial court. In his opinion denying a motion for a new trial the presiding judge said:

"That examination must have informed the respondent of just what the claim of the people was. I have carefully read all the testimony taken in police court, and I cannot find that the evidence here differed from the testimony in police court."

The ruling is fully sustained by the statute as interpreted in *Sneed* v. *People*, 38 Mich. 248, and *People* v. *Bemis*, 51 Mich. 422 (16 N. W. 794).

It is urged as error that the court failed to instruct the jury that respondent might under the information against him be convicted of manslaughter. This is based on respondent's testimony that he was on friendly terms with Sprague, had borrowed money from him, might be found from the evidence to have gone there again for that purpose, and Jagge's testimony of what respondent told him occurred on that occasion. By statute (section 15192, 3 Comp. Laws 1915) the killing of a human being

"which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder in the first degree."

In Wharton on Homicide (3d Ed.), § 119, it is said:

"In such case the turpitude of the criminal act supplies the place of deliberate and premeditated malice and is its legal equivalent, and the purpose to kill is conclusively presumed from the intention which is of the essence of the criminal act intended, and such a murder is a murder in the first degree under such statutes, though it is casual and unintentional."

Upon the preliminary examination and trial, the theory and sole claim of the prosecution was that respondent killed Sprague while robbing or trying to

rob him. The only defense made or claimed was an alibi, and that Sprague was murdered by some one else later than the prosecution fixed the crime. In his opening statement to the jury counsel for respondent said, in part:

"We will show you that whoever committed that murder went into that home after 6:10, * * * and we will show you that the old man from where he was at 6 o'clock, could not have reached home before 6:30. * * * We will show you that Sprague was murdered by some one else."

Both parties tried the case upon, these respective theories, and, when the prosecuting attorney in summing up to the jury made reference to some possible claim of self-defense, respondent's counsel objected and took an exception, saying:

"Because, as I understand this case, it is only a case of murder in the first degree or nothing, there is no manslaughter in this case, and cannot be under the law."

Counsel for the people said: "That is the claim; it is murder in the first degree or nothing." And upon that proposition the court instructed the jury in harmony with the claims both parties made.

The position then taken in the trial court by defendant is the opposite of that taken here. The trial court was not requested to charge the jury as is now claimed should have been done, nor was the question presented in respondent's motion for a new trial. Respondent's theory, and claim, then was and now is that the homicide was committed by another, that he was not present at all nor in any manner a party to it, and was wholly innocent. He was solicitous until after the verdict that the question of manslaughter should be excluded from the case, and to this he was entitled under the theory and attitude of both parties. The prosecution based its claim for conviction of mur-

der in the first degree on homicide while robbing or attempting to rob—that or nothing. The court fully and distinctly charged the jury that if robbery, or attempted robbery, by respondent was not shown beyond all reasonable doubt, he must be acquitted.

We find no occasion, under the circumstances shown here, to reverse this conviction for a claimed omission to charge the jury upon a point not then recognized by either side as tenable, not presented by any request, and not brought to the attention of the trial court by exception. *People* v. *Brott,* 163 Mich. 150 (128 N. W. 236).

The prosecutor was permitted upon re-direct examination of Jagge to show that respondent had told him of the commission of other offenses for which he had never been arrested. This followed a line of cross-examination as to the relations between respondent and Sprague and respondent and Jagge implying the improbability of respondent confiding to Jagge the facts of his culpability in this case as Jagge had related. It was offered by the prosecution to show intimacy and confidence between the parties to support probability of the witness' story. Though suggesting it was dangerous ground, the court at first admitted the answers for such proposed purpose, stating in that connection it would not be competent to show respondent did in fact commit the offenses mentioned; but after some discussion the court granted a motion of respondent's counsel "that all this testimony be stricken out," and told the jury: "Do not consider it in any way. * * * You will pay no attention to it." It is urged that the prosecuting attorney managed to get this prejudicial testimony before the jury under the specious argument repudiated in *People* v. *Schweitzer,* 23 Mich. 301, and striking it out could not cure the mischief thus done. This testimony was promptly stricken out and the jury instructed to dis-

regard it while the matter was fresh in their minds. That instruction was repeated and emphasized in the charge. It is urged by the prosecution that such evidence was competent for the purpose stated and should have been allowed to stand under the rule that offered testimony which is competent for one purpose and incompetent for another should be admitted, followed by instructions to the jury as to how and for what purpose only it may be considered. This seems questionable under some of our authorities, but the testimony was not permitted to stand, was not in the case, the jury was distinctly so instructed by the court and cautioned more than once to entirely disregard it. Under the facts and circumstances shown here, prejudicial error will not be presumed. In *People* v. *Droste,* 160 Mich. 66 (135 N. W. 87), it is said:

"It must be presumed that the jury considers only the testimony permitted by the court to stand."

The alleged prejudicial conduct on the part of the prosecuting attorney relates in the main to his attempts to introduce incompetent testimony and remarks in that connection. The evidence of the prosecution was necessarily indirect and circumstantial, built up largely from the fragmentary testimony of numerous witnesses to separate facts confirmatory of Jagge's testimony, furnishing links in the claimed chain of circumstantial proof. Respondent was represented by competent counsel, well qualified to protect his rights, and promptly urge objections to any questionable testimony offered by the prosecution which, as objections were made, naturally give rise to active discussion.

Serious objection is urged against the conduct of the prosecuting attorney in attempting to introduce a photograph of the deceased in evidence. It was claimed by the prosecution that Sprague was in the

habit of wearing a diamond stickpin in his tie, and when Jagge testified that respondent showed him a diamond, which he described as "a kind of clover-shaped," he was shown a photograph of Sprague and asked if "that diamond in the tie is the diamond you see." To which he replied that it was that shape and looked like it. The picture was then offered in evidence, and counsel for respondent said, "I object to the picture." The court held that the photograph was not competent, but suggested that, if there was any way of getting a picture of the diamond "by cutting that out," it might be introduced. A witness named Wood, who testified that Sprague lost his stickpin and later found it in his pocket, was shown the photograph, and, asked if "this is the stickpin you have reference to," said: "Very similar; the same one." The court said, in reply to a remark of the prosecutor as to its admissibility, that the picture of the stickpin would be proper, but not a picture of the deceased. Jagge had testified that respondent once told him of Sprague leaving his diamond lying around and that he would get his hands on it if he could. On cross-examination respondent testified he thought he had seen Sprague wear his pin and, being shown the picture of deceased, was asked if that was the pin he had seen him wear, to which he replied: "It looks like it, so far as I can see in the photograph; it must be his pin." No objection was made at this time or when Wood was shown the photograph. When objection was made, no reason was stated. The photograph of deceased was not admitted in evidence or exhibited to the jury. If the use made of the photograph was improper, which we question, the objection as made furnished no basis for an assignment of error.

That the prosecutor at times apparently manifested zeal without knowledge of applicable rules of evidence, and thereby put an extra burden on the trial court, is

indicated by some of the questions asked. The following transactions so indicating are urged as prejudicial and reversible error: Respondent had testified on his direct examination that he served time in Ionia for forgery and came out on November 18, 1915; on the afternoon of Wednesday, January 19, 1916, he went to Ionia to obtain permission to work in Detroit after getting a written permission from his "first friend." Interrogated upon cross-examination in relation to his connection with Jagge in that transaction, the following occurred:

"*Q.* Isn't it a fact that when you and Vincent Jagge were before Mr. Hyde, the probation officer, that you were told if you were out of town Vincent Jagge would be better off?

"*A.* I can't recall any such statement.

"*Mr. Herman:* Just a minute. I object to that as wholly irrelevant and immaterial.

"*Mr. Barnard:* It was in the presence of the accused.

"*The Court:* It may be stricken out, what somebody outside said about a man, it can't be used against him. It may be stricken out."

On rebuttal, Mr. Hyde was called by the prosecution, and the following occurred:

"*Q.* Whether or not you had occasion to have Lawrence Page and Vincent Jagge under your charge when they were under parole on the charge of forgery?

"*Mr. Herman:* There is no dispute about that.

"*The Court:* It is not competent anyway.

"*Mr. Barnard:* These are only preliminary questions.

"*The Court:* There might be some impeaching questions that are competent. You better ask him directly the impeaching questions.

"*Q.* The question I want to ask you is this: After Page was sent away to prison, didn't you have any further trouble with Jagge?

"*Mr. McKenna:* It doesn't rebut anything.

"*The Court:* It would not be competent.

"*Mr. Barnard:* For this purpose. I asked Mr. Page if it was a fact that he knew when he was sent to prison if Ed. Hyde did not state that Jagge was all right; he had no further trouble with him?

"*Mr. Herman:* Just a minute.

"*The Court:* It would not be competent. The jury will pay no attention to that statement."

That the proposed testimony was incompetent and the attempt to introduce it improper was promptly ruled and emphasized by the court, and the jury cautioned to pay no attention to it. Jagge was an early witness in the trial, which extended from the 6th to the 16th of June, inclusive. His close association with respondent was not questioned, and on cross-examination his record and shortcomings were caustically reviewed. Almost from the beginning his derelictions and respondent's were put in comparison under the indicated theory that any questionable conduct of the latter was attributable to his influence. This was dwelt upon by respondent's counsel in stating the defense to the jury, and it was said, amongst other things:

"We will show you that Lawrence did numerous things that way he ought not to have done. * * * We will show you that he did disabuse the old man's confidence; that he did forge his name."

Under this situation we cannot find that an unsuccessful effort of the prosecution to introduce incompetent testimony to meet defendant's theory which was promptly condemned by the court amounted to such prejudicial conduct affecting the merits of the controlling issue as to demand reversal.

In *People* v. *Swartz*, 118 Mich. 292 (76 N. W. 491), a murder case where prejudicial error was assigned on conduct of the prosecutor similar in many respects to that complained of here, it was said:

"The zeal of counsel 'in an important and closely

contested criminal case is apt to lead them to extreme expressions; but where the court directs and controls the trial, and promptly checks the attorney when he attempts to go further than his duty calls him, and properly instructs the jury to disregard the improper remarks, the verdict should not be set aside because, before this is done, an improper sentence has dropped from the lips of counsel."

Further discussion of alleged errors would serve no useful purpose. An examination of this record as a whole leads to the conclusion that the trial was impartially controlled and directed by the court, and respondent's rights were conservatively guarded by the monitions and adverse rulings on the occasions pointed out where it is claimed improper argument or questionable testimony were attempted by the prosecution. The court's instructions to the jury were full, explicit, and able, with especial emphasis and caution for respondent's protection on the presumption of innocence, burden of proof, to convince each juror beyond any reasonable doubt, the rules of circumstantial evidence with particular caution as to the great care to be exercised in drawing inferences from proven facts, which could only be considered at all after each was established to their satisfaction beyond all reasonable doubt; that all assertions or suggestions not sustained by proof should be disregarded; that any testimony or admissions of respondent's prior misconduct should only be considered as bearing upon his credibility, and not as evidence of his guilt under the charge against him, saying among other things the evidence alone could be considered by them, and:

"The evidence comes from the testimony of the witnesses that you have heard here upon the stand, and you consider only that which was admitted in evidence; anything that was excluded or stricken out after it was received you will not consider. * * *

"And again let me say to you, gentlemen of the jury,

that, if any statements have crept into this case from which you might infer that the respondent here has been guilty of any other offense or offenses than the one that I have mentioned of forgery you will not consider them as bearing upon the guilt of the respondent in this case. The respondent is here upon trial for the offense only that is charged in the information in this case, and he is not to be prejudiced in this case, or convicted in this case, by reason of the commission of any other offense. These charges, if any, or insinuations, if any, against the respondent concerning other matters, should be wholly disregarded by you. * * * "

We are impressed that respondent had at the hands of the court and jury a fair and impartial trial, disclosing no prejudicial error demanding reversal. After examination and consideration of the entire case as disclosed by this record, we are not of the opinion that it affirmatively appears the errors complained of have resulted in a miscarriage of justice.

The conviction is therefore affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, and BROOKE, JJ., concurred. FELLOWS, J., did not sit.