PEOPLE v CARTER

Docket No. 64583. Argued March 3, 1981 (Calendar No. 2).—Decided
December 23, 1982. Rehearing denied 417 Mich 1105.

Alvin D. Carter was convicted by a jury in the Jackson Circuit
Court, Charles J. Falahee, J., of aiding and abetting the com-
mission of unarmed robbery and extortion and of conspiracy to
commit both offenses. The Court of Appeals, Danhof, C.J., and
V. J. Brennan and Carroll, JJ., in an opinion per curiam,
affirmed the convictions of extortion and conspiracy to commit
extortion, but reversed the convictions of unarmed robbery and
conspiracy to commit unarmed robbery on the ground that the
convictions of unarmed robbery and extortion, arising from the
single act of obtaining money from the complainant, consti-
tuted double jeopardy (Docket No. 30029). The defendant ap-
peals.

In an opinion written by the late Justice Moody and adopted
as their own by Chief Justice Fitzgerald and Justices Williams,
Coleman, and Ryan, the Supreme Court *held:*

On the facts of the case, the defendant was properly con-
victed of both aiding and abetting and conspiracy.

1. Criminal conspiracy involves a mutual agreement or un-
derstanding, express or implied, between two or more persons

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Conspiracy § 10.
[2] 16 Am Jur 2d, Conspiracy § 42.
[3, 4] 16 Am Jur 2d, Conspiracy § 6.
[5] 16 Am Jur 2d, Conspiracy § 37.
   31 Am Jur 2d, Extortion, Blackmail, and Threats § 8.
[6] 81 Am Jur 2d, Witnesses § 2.
[7] 29 Am Jur 2d, Evidence §§ 371.6, 371.8.
   Admissibility of evidence of photographic identification as affected
     by allegedly suggestive identification procedures. 39 ALR3d 1000.
   Admissibility of evidence of showup identification as affected by
     allegedly suggestive showup procedures. 39 ALR3d 791.
[8] 29 Am Jur 2d, Evidence §§ 371, 371.4
   Admissibility of evidence of lineup identification as affected by
     allegedly suggestive lineup procedures. 39 ALR3d 487.
[9] 16 Am Jur 2d, Conspiracy §§ 3, 9.

to commit a criminal act or to accomplish a legal act by unlawful means. The crime is complete upon the formation of the agreement; it is not necessary to establish any overt act in furtherance of the conspiracy. To convict a defendant of conspiracy, it is necessary to establish a specific intent to combine with others and a specific intent to accomplish an illegal objective. Direct proof of agreement is not required, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts, and conduct of the parties establish an agreement in fact.

2. Conspiracy is a crime separate and distinct from the substantive crime which is its object. The guilt or innocence of a conspirator does not depend on the accomplishment of the goals of the conspiracy. A defendant may be convicted of conspiracy and of the substantive crime, and a conviction of conspiracy does not merge with a conviction of a completed offense unless the substantive crime necessarily requires the participation and cooperation of two persons. Where cooperative action is a necessary element of the substantive offense, it is presumed that the Legislature took that element into account in setting the penalty for the offense. The justification for prosecuting a conspiracy and a substantive offense separately, the increased and special danger to society presented by group activity as opposed to individual activity, is absent where the substantive offense requires concerted action.

3. In this case, the substantive crime is extortion. No agreement is required to complete the crime. The crime logically may be committed by one person. Aiding and abetting is not a substantive offense. Rather, it is a means of connecting a person with a completed criminal act. It takes on criminal characteristics only because of its link to the illegal action. The basic charge against the defendant is not aiding and abetting, but the extortion which resulted from the aiding and abetting. The aiding and abetting statute provides that a person who aids in the commission of a crime is to be treated exactly as if he had directly committed it.

4. The defendant's convictions of conspiracy and of aiding and abetting extortion were of two separate and distinct crimes, and do not amount to the multiple punishment proscribed by the Double Jeopardy Clause. Nor is either crime a cognate or lesser included offense of the other. It is possible to commit either crime without committing the other. Although . aiding and abetting extortion and conspiracy to commit extortion involve concerted activity, they are not of the same class or category, nor do they reflect a common legislative purpose.

The conspiracy statute prescribes punishment for the planning of the offense and focuses upon the special dangers resulting from group action. The aiding and abetting statute punishes the actual commission of a crime. When the jury found the defendant guilty of aiding and abetting extortion, it did not thereby find sufficient facts to find him guilty of conspiracy. It additionally found that he actively participated in the joint venture and that he shared the intent to commit the extortion. Proof of either crime did not necessarily require the finding that the defendant was guilty of the other.

5. The defendant was not entitled to a new trial on the ground that the prosecutor failed to indorse and produce a res gestae witness at trial. The witness specified by the defendant was not a res gestae witness. He was too far removed from the criminal event. He was not an eyewitness, and never saw the defendant until two years after the crime. The fact that he saw only the defendant's conspirator does not preclude the defendant's participation in the crime. Testimony by the witness would not have been sufficient to create a reasonable doubt regarding the defendant's guilt.

6. The photographic identification of the defendant was not impermissibly suggestive. Additionally, there was a sufficient independent basis for identification of the defendant. Under the totality of the circumstances, the evidence was properly allowed during trial.

Affirmed.

Justice Kavanagh, joined by Justice Levin, dissenting in part, would affirm the conviction of extortion, but would set aside the conviction of conspiracy. When the extortion was carried out, the charged conspiracy merged into the completed act.

94 Mich App 501; 290 NW2d 46 (1979) affirmed.

### Opinion of the Court

1. Conspiracy — Unlawful Agreement — Elements of Crime.

Criminal conspiracy involves a mutual agreement or understanding, express or implied, between two or more persons to commit a criminal act or to accomplish a legal act by unlawful means; the crime is complete upon the formation of the agreement, and it is not necessary to establish any overt act in furtherance of the conspiracy (MCL 750.157a; MSA 28.354[1]).

2. Conspiracy — Unlawful Agreement — Proof.

To convict a defendant of conspiracy, direct proof of agreement is not required, nor is it necessary that a formal agreement be

proven, but it is sufficient if the circumstances, acts, and conduct of the parties establish an agreement in fact (MCL 750.157a; MSA 28.354[1]).

3. CONSPIRACY — SUBSTANTIVE CRIMES — MERGER.

A defendant may be convicted both of conspiracy and of the substantive crime which is its object, and the conviction of conspiracy does not merge with a conviction of a completed offense unless the substantive crime necessarily requires the participation and cooperation of two persons (MCL 750.157a; MSA 28.354[1]).

4. CONSPIRACY — SUBSTANTIVE CRIMES — MERGER.

The justification for prosecuting a conspiracy and the substantive offense which is its object separately is the increased and special danger to society presented by group activity; where the substantive offense includes cooperative action as a necessary element, the special danger is absent, and the Legislature is presumed to have considered that element in setting the penalty for the offense (MCL 750.157a; MSA 28.354[1]).

5. EXTORTION — CONSPIRACY — AIDING AND ABETTING — DOUBLE JEOPARDY.

No agreement is necessary to complete the crime of extortion, which may be committed by one person, and aiding and abetting extortion is not of the same class or category as conspiracy to commit extortion or a cognate or lesser included offense of conspiracy; thus, a person may be convicted both of aiding and abetting extortion and conspiracy to commit extortion without violating the proscriptions of the Double Jeopardy Clause (US Const, Am V; Const 1963, art 1, § 15; MCL 750.157a, 750.410, 767.39; MSA 28.354[1], 28.410, 28.979).

6. CRIMINAL LAW — RES GESTAE WITNESSES — INDORSEMENT AND PRODUCTION OF WITNESSES.

The prosecutor was under no duty to indorse and produce a witness as a res gestae witness at a robbery, notwithstanding a general request for exculpatory material by the defendant, where the statements of the witness about the actions of a person other than the defendant before and after the robbery did not necessarily contradict the prosecutor's case, the witness was not an eyewitness to some event in the continuum of the criminal transaction whose testimony would have aided in developing a full disclosure of the facts surrounding the offense, other evidence was very persuasive of the defendant's guilt, and the witness's testimony would not have been sufficient to

create a reasonable doubt regarding the defendant's guilt (MCL 767.40; MSA 28.980).

7. CRIMINAL LAW — WITNESSES — PHOTOGRAPHIC IDENTIFICATION — INDEPENDENT BASIS.

The danger of an improperly conducted pretrial photographic identification is that it may unduly influence subsequent identification, and an in-court identification may be made on the basis of the photographic showup rather than from an independent recollection of the crime; therefore, where the pretrial identification is improperly conducted, an independent basis for any in-court identification must be established.

8. CRIMINAL LAW — WITNESSES — IDENTIFICATION — IMPROPER PROCEDURE — INDEPENDENT BASIS.

The criteria used to determine whether there is an independent basis for an in-court identification of a defendant by a witness when a pretrial identification has been improperly conducted include the witness's prior relationship with or knowledge of the defendant, the witness's opportunity for observation during the crime, the length of time between the crime and the lineup identification, accuracy of description, any discrepancy between a pre-lineup description and the actual appearance of the defendant, proper identification or failure to identify the defendant on a prior occasion, identification of any other person before the lineup, the nature of the offense and the physical and psychological state of the victim, and any idiosyncratic or special features of the defendant.

OPINION BY KAVANAGH, J.

9. EXTORTION — CONSPIRACY — AIDING AND ABETTING — MERGER.

A conspiracy to commit extortion merges with the substantive crime upon the completion of the extortion, and thus a person may not be convicted both of aiding and abetting extortion and of conspiracy to commit the act (MCL 750.157a, 750.213, 767.39; MSA 28.354[1], 28.410, 28.979).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Edward J. Grant,* Prosecuting Attorney, and *Bruce A. Barton,* Special Prosecuting Attorney, for the people.

State Appellate Defender (by *Norris J. Thomas, Jr.,* Chief Deputy Defender) for the defendant.

FITZGERALD, C.J., and WILLIAMS, COLEMAN, and RYAN, JJ. This opinion was written by Justice BLAIR MOODY, JR., prior to his death on November 26, 1982. We concur in this opinion and adopt it as our own.

The principal issue presented by this case is whether a defendant may be convicted both of aiding and abetting the commission of extortion, MCL 767.39; MSA 28.979 and MCL 750.213; MSA 28.410, and conspiracy to commit that same crime, MCL 750.157a; MSA 28.354(1). We hold that, under the facts of this case, the defendant was properly convicted under both the aiding and abetting and conspiracy statutes.

In addition to challenging his dual convictions, defendant raises a number of other issues involving alleged errors that occurred before and during his trial. He challenges as impermissibly suggestive the photographic identification which led to his arrest. Defendant further alleges that the prosecution's failure to indorse and produce a res gestae witness deprived him of a fair trial. Finally, he claims that the trial court erred in allowing the jury to hear testimony that defendant had been fired from his job for assaulting his supervisor.

We find these issues to be without merit. Accordingly, we affirm defendant's convictions of extortion under an aiding and abetting theory and conspiracy to commit extortion.

I

Alvin D. Carter was charged with aiding and abetting another to commit both unarmed robbery, MCL 750.530; MSA 28.798, and extortion, MCL 750.213; MSA 28.410, and with conspiracy to commit both offenses, MCL 750.157a; MSA 28.354(1).

The charges against the defendant arose out of the taking of $1,365.00 from an employee of the Consumers Power Company customer service office in Jackson around noon on December 19, 1975. The employee, Mrs. Peggie Johnson, was approached by a man, subsequently identified as Edward Kimble, who handed her a note threatening her three sons unless she gave him money. According to her testimony at defendant's trial, she complied with the demand because she feared for her own safety and that of her children.

Mrs. Johnson also testified that she had never seen Edward Kimble before the robbery, but that she knew Alvin Carter well and regarded him as a family friend. Further, she indicated that approximately one or two months before the robbery, the defendant stopped in at the Consumers Power Company office and "question[ed] us about the lunch hours".

Kimble and his girlfriend, Diane Potter, were arrested the day after the robbery while shopping at a J. C. Penney store located across the street from the Consumers Power Company office. Potter's identification of the defendant at a photographic showup approximately three weeks later led to Alvin Carter's arrest.

Edward Kimble pled guilty to unarmed robbery and received a 5-1/2- to 15-year sentence. Testifying for the prosecution at defendant's trial, he indicated that he first met Carter, who he knew only as "Hank", at Jackson Prison, where he was serving a sentence for armed robbery and Carter was employed as a prison guard. According to Kimble, he again came into contact with the defendant in November of 1975 at Leake's Lounge, a

Jackson bar they both frequented. Kimble testified further that he and Carter discussed the "Consumers Power job" on the afternoon of December 18, the day before the robbery; that on that same evening Carter came to see him at the Sewell Hotel, where he lived with Diane Potter; that during that visit Carter wrote the threatening note that was to be presented to Peggie Johnson; and that Potter copied the note because Carter was afraid the victim would recognize his handwriting.

Kimble admitted taking the note to the Consumers Power office around noon on December 19, presenting it to Peggie Johnson, and receiving the money in a paper bag. He testified that he then met Carter and gave the money to him at a place called "the roller room", where Carter had been waiting. Both men returned to Kimble's room at the Sewell Hotel, Kimble arriving about five minutes after Carter, and Carter divided the money.

Diane Potter, who was not charged with participation in the crime,[1] corroborated Kimble's testimony about the events at the Sewell Hotel on the evening of December 18 and after the robbery on December 19. She added that while Carter was drafting the note he and Kimble were "whispering a conversation back and forth", and that she heard Carter ask Kimble if the content looked all right to him. After she rewrote the note, she tore up Carter's copy and flushed it down the toilet. Finally, Potter indicated that she had seen Carter approximately 6 to 12 times before the night of

[1] Detective Michael Rand testified that no warrant had been sought because the police had not given her *Miranda* warnings before questioning her. See *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

December 18, both at the apartment and at Leake's Lounge.

The defendant denied any involvement in the crime and presented an alibi defense. He denied having ever been in Kimble's room at the Sewell Hotel or having met Kimble while employed as a prison guard. He further denied even knowing Kimble or Potter, other than casually from seeing them at Leake's Lounge.

The jury, after deliberating for seven and one-half hours, returned a verdict of guilty on all four counts. On July 14, 1976, defendant was sentenced to 7-1/2 to 15 years with credit for 189 days on the unarmed robbery and conspiracy to commit unarmed robbery convictions and to 7-1/2 to 20 years with credit for 189 days on the extortion and conspiracy to commit extortion convictions, with all four sentences to be served concurrently.

In a published per curiam opinion, the Court of Appeals affirmed defendant's convictions of extortion and conspiracy to commit extortion, but reversed, as violative of the proscription against double jeopardy, US Const, Am V; Const 1963, art 1, § 15, the convictions of unarmed robbery and conspiracy to commit unarmed robbery. *People v Carter,* 94 Mich App 501; 290 NW2d 46 (1979). This Court granted defendant's application for leave to appeal his remaining convictions. 409 Mich 867 (1980). The people do not contest the reversal by the Court of Appeals of defendant's robbery-related convictions.

II

Defendant attacks his joint convictions of aiding

and abetting the commission of extortion and conspiracy to perpetrate extortion on three grounds, all of which relate to principles of double jeopardy. He argues, in the alternative, that the charge of conspiracy should merge with, or be absorbed into, the charge of the completed crime, and that his conviction of both crimes is in essence unconstitutional multiple punishment for the same offense under federal and state double jeopardy interpretations.

A

Criminal conspiracy occupies a unique place in our criminal justice system. It is defined as "a partnership in criminal purposes", *United States v Kissel,* 218 US 601, 608; 31 S Ct 124; 54 L Ed 1168 (1910), a mutual agreement or understanding, express or implied, between two or more persons to commit a criminal act or to accomplish a legal act by unlawful means. While the offense has its origins in the common law, it is now specifically proscribed by statute, which sets forth the penalties for its commission. MCL 750.157a; MSA 28.354(1).[2]

---

[2] MCL 750.157a; MSA 28.354(1) provides:

"Any person who conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner is guilty of the crime of conspiracy punishable as provided herein:

"(a) Except as provided in paragraphs (b), (c) and (d) if commission of the offense prohibited by law is punishable by imprisonment for 1 year or more, the person convicted under this section shall be punished by a penalty equal to that which could be imposed if he had been convicted of committing the crime he conspired to commit and in the discretion of the court an additional penalty of a fine of $10,000.00 may be imposed.

"(b) Any person convicted of conspiring to violate any provision of this act relative to illegal gambling or wagering or any other acts or ordinances relative to illegal gambling or wagering shall be punished by imprisonment in the state prison for not more than 5 years or by a fine of not more than $10,000.00, or both such fine and imprisonment.

"The gist of the offense of conspiracy lies in the unlawful agreement". *People v Atley,* 392 Mich 298, 311; 220 NW2d 465 (1974). The crime is complete upon formation of the agreement; in Michigan, it is not necessary to establish any overt act in furtherance of the conspiracy as a component of the crime.[3] However, a twofold specific intent is required for conviction: intent to combine with others, and intent to accomplish the illegal objective. Perkins, Criminal Law (2d ed), ch 6, § 5, p 629.

In spite of the importance of the element of agreement in conspiracy liability,

"[d]irect proof of agreement is not required, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts, and conduct of the parties establish an agreement in fact. * * *.

"Furthermore, conspiracy may be established, and frequently is established by circumstantial evidence". (Citations omitted.) *People v Atley,* p 311.[4]

"(c) If commission of the offense prohibited by law is punishable by imprisonment for less than 1 year, except as provided in paragraph (b), the person convicted under this section shall be imprisoned for not more than 1 year nor fined more than $1,000.00, or both such fine and imprisonment.

"(d) Any person convicted of conspiring to commit a legal act in an illegal manner shall be punished by imprisonment in the state prison for not more than 5 years or by a fine of not more than $10,000.00, or both such fine and imprisonment in the discretion of the court."

[3] Many other states do require, as an element of proof of the crime, that an overt act in pursuance of the conspiratorial end be taken. See Model Penal Code, § 5.03, Appendix A, p 156 (Tentative Draft No 10). The overt-act requirement tends to be relatively easy to meet; virtually any act, no matter how insignificant, may suffice. See Model Penal Code, Comment, § 5.03, pp 96-97 (Tentative Draft No 10).

[4] The ability to establish the existence of such an agreement through circumstantial evidence and the broad inferences permitted the jury in finding mutual understanding are among the reasons conspiracy has been characterized as "the darling of the modern prosecutor's nursery". *Harrison v United States,* 7 F2d 259, 263 (CA 2, 1925). Among the other advantages afforded the prosecution in a conspiracy case are: the vagueness in the definition and elements of

It is a settled principle of black-letter law that conspiracy is a crime that is separate and distinct from the substantive crime that is its object. La-Fave & Scott, Criminal Law, § 62, p 494; *People v Tinskey*, 394 Mich 108; 228 NW2d 782 (1975); *People v Chambers*, 279 Mich 73; 271 NW 556 (1937). The guilt or innocence of a conspirator does not depend upon the accomplishment of the goals of the conspiracy. More importantly in the context of the instant case, a conviction of conspiracy does not merge with a conviction of the completed offense.[5] Thus, a defendant may be convicted and punished for both the conspiracy and the substantive crime. *Pinkerton v United States*, 328 US 640; 66 S Ct 1180; 90 L Ed 1489 (1946).

The cited justification for the prosecution of conspiracy as a crime independent of, and often in addition to, the prosecution of the object offense is the alleged increased and special danger to society presented by group as opposed to individual activ-

---

the crime, *Krulewitch v United States*, 336 US 440, 445; 69 S Ct 716; 93 L Ed 790 (1949) (Jackson, J., *concurring)*; the fact that the statements of a co-conspirator made during and in furtherance of a conspiracy are specifically excluded from the definition of hearsay and thus admissible against another co-conspirator, MRE 801(d)(2)(E); the ability to try co-conspirators jointly; and, the flexibility in the selection of the place of trial, in contrast to the stricter venue provisions governing most criminal trials. See, generally, LaFave & Scott, Criminal Law, § 61, pp 455-459.

[5] At early common law, all conspiracies were misdemeanors, which merged into any felony committed in furtherance thereof because of the procedural differences between felony and misdemeanor trials. Under this merger doctrine, only the felony was punishable. See *People v Richards*, 1 Mich 216; 51 Am Dec 75 (1849). Since the procedural differences which justified the doctrine no longer exist, it has now been largely abrogated. *Pinkerton v United States*, 328 US 640; 66 S Ct 1180; 90 L Ed 1489 (1946). Michigan has abolished the doctrine of merger by statute. MCL 768.4; MSA 28.1027; *People v Causley*, 299 Mich 340; 300 NW 111 (1941). See also *People v Wilder*, 411 Mich 328, 344, fn 9; 308 NW2d 112 (1981), in which this Court noted that the "modern" interpretation of merger refers to necessarily included offenses in the double jeopardy context.

ity.[6] The "greater threat" rationale was detailed in *Callahan v United States,* 364 US 587, 593-594; 81 S Ct 321; 5 L Ed 2d 312 (1961):

"[C]ollective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise."[7]

One of the major exceptions to the general principle that conspiracy and its target offense are separately punishable is known as Wharton's Rule. This rule, which operates as a substantive limitation upon the scope of the crime of conspiracy, states that an agreement by two persons to commit a substantive crime cannot be prosecuted as a conspiracy where the crime itself necessarily requires the participation and cooperation of two

---

[6] Another aspect of conspiracy as an offense in our legal system is that it allows prosecution for preparatory conduct which even precedes attempt and thus functions as a means of crime prevention. Of course, this rationale loses force when, as in this case, the substantive offense has been completed. See Model Penal Code, Comment, § 5.03, pp 96-97 (Tentative Draft No 10).

[7] Perhaps reflecting these "greater dangers", the statute allows conspiracy to be punished more severely than the substantive offense in certain instances. See MCL 750.157a; MSA 28.354(1). See, also, *Iannelli v United States,* 420 US 770; 95 S Ct 1284; 43 L Ed 2d 616 (1975).

persons.[8] Thus, where concerted activity and a plurality of agents are essential elements of a substantive offense, Wharton's Rule bars a prosecution for conspiracy to commit that crime. Defendant asserts that, given the offenses at issue in this case, Wharton's Rule precludes his conviction of conspiracy to commit extortion.

The classic Wharton's Rule offenses—adultery, bigamy, dueling, and incest—are those crimes where "the conspiracy to commit them is in such close connection with the objective offense[s] as to be inseparable from them". *In re Vickers,* 371 Mich 114, 117; 123 NW2d 253 (1963). Additionally, the crimes are such that "[t]he parties to the agreement are the only persons who participate in [the] commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large". *Iannelli v United States,* 420 US 770, 782-783; 95 S Ct 1284; 43 L Ed 2d 616 (1975).[9]

---

[8] In its original formulation, Wharton's Rule provided:

"When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be maintained. * * * In other words, when the law says, 'a combination between two persons to effect a particular end shall be called, if the end be effected, by a certain name,' it is not lawful for the prosecution to call it by some other name; and when the law says, such an offense—*e.g.,* adultery—shall have a certain punishment, it is not lawful for the prosecution to evade this limitation by indicting the offense as conspiracy." 2 Wharton, Criminal Law (12th ed), § 1604, p 1862.

For a more contemporary statement of the rule, see 1 Anderson, Wharton's Criminal Law & Procedure (1957 ed), § 89, p 191:

"An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission."

[9] This "victimless crime" limitation has not been strictly applied by the courts. In a recent case, this Court applied Wharton's Rule to reverse a police officer's conviction of conspiracy to obstruct justice. *People v Davis,* 408 Mich 255; 290 NW2d 366 (1980). Wharton's Rule has also been applied in bribery cases. See, *e.g., United States v*

The rationale for the rule is based on two different analyses. The primary justification relates to legislative intent; where cooperative action is a necessary component of the substantive offense, it is presumed that the Legislature took that element into account when setting forth the penalty for the offense. Recent Developments, *Criminal Law—Multiple Punishment Under the Organized Crime Control Act—A Need for Re-examination of Wharton's Rule and Double Jeopardy,* 52 Wash L Rev 142 (1976). In addition, because the target offense itself requires concerted action, the combination constituting the conspiracy creates no added danger, "because nothing is involved which will not [also] be present whenever the offense is committed." Perkins, Criminal Law (2d ed), ch 6, § 5, p 620.

In practice, Wharton's Rule generally operates as a judicial presumption to proscribe a conspiracy charge in the absence of legislative intent to the contrary. *Iannelli v United States, supra,* 420 US 782.[10] The applicability of the rule depends on the

*Dietrich,* 126 F 664 (D Neb, 1904). It has also been applied to offenses such as buying, selling or delivery of contraband, and receiving stolen goods.

For additional discussion of Wharton's Rule, see, generally, Westen & Drubel, *Toward a General Theory of Double Jeopardy,* 1978 Supreme Court Rev 81; Recent Cases, *Criminal Law—Criminal Conspiracy—"Wharton's Rule" as Exception from Charge of Criminal Conspiracy,* 8 U Ch L Rev 138 (1940); Comment, *An Analysis of Wharton's Rule: Iannelli v United States and One Step Beyond,* 71 Nw U L Rev 547 (1976); Recent Developments, *Criminal Law—Multiple Punishment Under the Organized Crime Control Act—A Need for Re-examination of Wharton's Rule and Double Jeopardy,* 52 Wash L Rev 142 (1976).

[10] The relationship between Wharton's Rule and principles of double jeopardy is somewhat less than clear. Although the rule appears to have arisen in the double jeopardy context, the United States Supreme Court has interpreted it as a principle of "broader application", which "does not rest on principles of double jeopardy". Thus, although the purpose of the rule is similar to that of the proscription against double jeopardy, the analysis engendered by the two principles and their application to specific cases may differ. See *People v Davis,* 408 Mich 255, 315, fn 9; 290 NW2d 366 (MOODY, J., *dissenting*).

nature of the target offense that constitutes the object of the conspiracy. Specifically, the focus is upon the elements of the crime rather than upon the factual circumstances of the particular case. *Iannelli,* p 780. Thus, the test is satisfied when, by definition, the object crime necessarily requires the participation of two people. If the offense could logically be accomplished by a single individual, Wharton's Rule does not apply. The fact that in a particular case cooperation between the offenders was a practical necessity, *i.e.,* the crime could not have been committed without concerted action or would have been made much more difficult without it, is not sufficient to invoke the rule. *State v Huegin,* 110 Wis 189; 85 NW 1046 (1901); LaFave & Scott, *supra,* pp 492-493; *People v Davis,* 408 Mich 255, 285, fn 6; 290 NW2d 366 (1980) (LEVIN, J., *concurring).* See also 408 Mich 255, 320-321 (MOODY, J., *dissenting).*

Thus, to determine the applicability of Wharton's Rule, "accurate identification of [the] target offense is essential". *People v Davis,* p 280 (LEVIN, J., *concurring).* The controversy in the instant case arises because the defendant and the prosecution focus on different aspects of the target crime in their analyses, which leads them to different conclusions regarding the applicability of Wharton's Rule.

The defendant focuses upon the aiding and abetting aspect of the extortion offense. He argues that aiding and abetting necessarily requires concerted action among a plurality of agents. "The *sine qua non* of aiding and abetting is that more than one person must be criminally involved". *People v Parks,* 57 Mich App 738, 743; 226 NW2d 710 (1975). Therefore, the agreement embodied in the conspiracy has no element of added danger that is

not already present upon commission of the substantive crime. Further, when aiding and abetting occurs, no additional persons are involved in the conspiracy than are required to commit the object offense. Defendant adds that both the aiding and abetting and conspiracy statutes are directed at the same evil, namely, cooperation between perpetrators of crime. Thus, Wharton's Rule applies, and his conspiracy conviction should be vacated.

The prosecutor, in contrast, focuses on the criminal act of extortion in his Wharton's Rule analysis. The elements of extortion are: a malicious threat of violence or criminal accusation, and an intent to extort money. MCL 750.213; MSA 28.410.[11] No agreement is required to complete the crime; further, the crime may logically be committed by one person. Therefore, Wharton's Rule is inapposite in this case.

We agree with the prosecutor. Defendant's emphasis upon the aiding and abetting aspect of the offense is misplaced under these circumstances. The purpose of the aiding and abetting statute, MCL 767.39; MSA 28.979, is to ensure that any person who participates in a substantive offense is held liable as if he had directly committed the offense.[12] *People v Palmer,* 392 Mich 370; 220

---

[11] The statute provides:

"Any person who shall, either orally or by a written or printed communication, maliciously threaten to accuse another of any crime or offense, or shall orally or by any written or printed communication maliciously threaten any injury to the person or property or mother, father, husband, wife or child of another with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do or refrain from doing any act against his will, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 20 years or by a fine of not more than 10,000 dollars."

[12] Another expressed purpose behind the statute is to allow an aider and abettor to be prosecuted without regard to the conviction or acquittal of the principal. *People v Smith,* 271 Mich 553; 260 NW 911 (1935). However, to establish aiding and abetting, it must be shown

NW2d 393 (1974). The statute declares that one who "procures, counsels, aids or abets" in the commission of a crime may be "prosecuted, indicted, tried and on conviction shall be punished" as a principal.[13] Aiding and abetting is not in and of itself a substantive offense. It is, rather, a means of connecting a person with a completed criminal act, whether that act be extortion, as in the instant case, or any other action defined as unlawful. It takes on criminal characteristics only because of its link to that illegal action.

Reduced to its bare essentials, the basic charge against a defendant is not aiding and abetting, but rather the substantive crime that results from the aiding and abetting. In assessing the applicability of Wharton's Rule, the target offense to be evaluated is, therefore, the underlying substantive crime itself, not the means developed to hold a person liable for that crime.

In the instant case, of course, the substantive crime is extortion. Extortion is not a crime of such a nature as to necessarily require the participation of two persons.[14] Therefore, defendant's prosecu-

---

that a crime was completed by someone and that the defendant aided and abetted the commission of that crime. *People v Mann,* 395 Mich 472; 236 NW2d 509 (1975).

[13] MCL 767.39; MSA 28.979 reads in its entirety:

"Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense."

[14] In *People v Davis,* fn 9 *supra,* the target crime at issue, loosely termed "obstruction of justice", is not a "traditional" Wharton's Rule offense. However, a majority of the justices found that the essence of the crime in *Davis* was an agreement not to arrest another in exchange for money. Thus, since agreement was a necessary element of the offense, Wharton's Rule precluded a conspiracy conviction. Unlike the crime in *Davis,* the crime in the instant case cannot be construed to require the element of agreement.

tion and conviction for conspiracy to commit extortion does not violate Wharton's Rule.[15]

In addition, any presumption in favor of the application of Wharton's Rule is rebutted by the legislative intent expressed in the aiding and abetting statute. As noted earlier, conspiracy does not merge with the completed substantive crime that is its object. The aiding and abetting statute states that in all respects—prosecution, indictment, trial and punishment—one who aids in the commission of a crime is to be treated exactly as if he had directly committed the offense. To provide that conspiracy would merge with the object crime for an aider and abettor but not for a principal would be to provide for *differences* in the prosecution, indictment, trial and punishment of accessories as opposed to principals. Under such a rule, upon completion of the crime, a principal could be prosecuted, indicted, tried and punished[16] for conspiracy, while an aider and abettor could not, in direct

[15] Other courts that have addressed the issue of the applicability of Wharton's Rule to the relationship between conspiracy to commit a substantive crime and aiding and abetting the commission of the offense have reached the same result with respect to a variety of crimes. See, *e.g., State v Williams,* 395 A2d 1158 (Me, 1978) (murder); *State v Campbell,* 217 Kan 756; 539 P2d 329 (1975); *State v Johns,* 184 Conn 369; 439 A2d 1049 (1981) (burglary). In Michigan, at least one panel of the Court of Appeals has arrived at the same conclusion. See *People v Hamp,* 110 Mich App 92; 312 NW2d 175 (1981) (first-degree murder).

[16] The fact that a sentence for conspiracy is served concurrently with that for the substantive offense in Michigan rather than consecutively as in the federal system does not diminish the fact that conviction and punishment for both offenses has more severe consequences than conviction and punishment for only the target offense. In *People v Martin,* 398 Mich 303, 310; 247 NW2d 303 (1976), this Court discussed the collateral effects of such dual convictions:

"The second conviction punishes appellant in several ways, including parole considerations, impeachment at subsequent trials, [and] habitual offender treatment."·

See, also, *People v Stewart (On Rehearing),* 400 Mich 540; 256 NW2d 31 (1977).

contravention of the equal treatment mandated by the statute.[17]

### B

Defendant argues further that his convictions of conspiracy and aiding and abetting with respect to the same substantive crime violate his federal constitutional right not to be placed twice in jeopardy for the same act. See US Const, Am V.[18]

The guarantee against double jeopardy in the Constitution of the United States has been made applicable to the states through the Fourteenth Amendment. That guarantee incorporates three distinct constitutional protections:

"It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v Pearce,* 395 US 711, 717; 89 S Ct 2072; 23 L Ed 2d 656 (1969).

In the instant case, the question is one of multiple punishment. Under such circumstances the Double Jeopardy Clause operates to protect the defendant from receiving double punishment for

---

[17] This analysis of legislative intent for the purposes of Wharton's Rule does not necessarily determine the double jeopardy issue presented to this Court. Cf. *People v Jankowski,* 408 Mich 79; 289 NW2d 674 (1980); *Wayne County Prosecutor v Recorder's Court Judge,* 406 Mich 374; 280 NW2d 793 (1979), *app dis sub nom Brintley v Michigan,* 444 US 948; 100 S Ct 418; 62 L Ed 2d 317 (1979). Neither party has so argued; instead, each has briefed the double jeopardy question in terms of the more traditional application of the constitutional protection "as a restraint on courts and prosecutors imposing double punishment for a single criminal act." *Jankowski, supra,* p 86. Further, the question of legislative intent and its effect upon double jeopardy analysis was much more directly implicated in *Wayne County Prosecutor* than it is in the instant case.

[18] "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

what is in reality a single criminal offense. *People v Jankowski,* 408 Mich 79; 289 NW2d 674 (1980).

The problem in multiple punishment cases, as in multiple prosecution cases, is to determine whether the charges at issue constitute the "same offense" for double jeopardy purposes. In *Blockburger v United States,* 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932), the Court articulated the definition of the "same offense":

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

The *Blockburger* test focuses on the statutory elements of the offenses involved, not on the particular facts introduced at trial to establish their commission. *Iannelli v United States,* 420 US 770; 95 S Ct 1284; 43 L Ed 2d 616 (1975).[19]

Defendant concedes that under a strict application of the *Blockburger* test, aiding and abetting and conspiracy would be considered different offenses because aiding and abetting requires a completed crime and aiding and abetting by the defendant in the commission of that crime, *People v Mann,* 395 Mich 472; 236 NW2d 509 (1975), and conspiracy requires a combination or agreement.

---

[19] In this sense, the application of the *Blockburger* rule is similar to the application of Wharton's Rule. As does Wharton's Rule, the *Blockburger* test incorporates a rebuttable presumption against multiple punishment.

The "same evidence" test of *Blockburger* has been soundly criticized by commentators and courts as unduly restricting the scope of double jeopardy protection. See, *e..g,* Kirchheimer, *The Act, the Offense and Double Jeopardy,* 58 Yale L J 513 (1949); *People v White,* 390 Mich 245; 212 NW2d 222 (1973).

*People v Atley,* 392 Mich 298; 220 NW2d 465 (1974).

As an offshoot of the *Blockburger* rule, the Supreme Court has applied a necessarily lesser-included-offense analysis in determining whether offenses are the same for double jeopardy purposes.[20] If one offense is necessarily included in the other, it is the "same offense" and cannot be additionally punished. Reference is made to state law for definitions of the offenses involved and also to ascertain whether they stand in the relation of greater- and lesser-included offenses. *Brown v Ohio,* 432 US 161; 97 S Ct 2221; 53 L Ed 2d 187 (1977). Again, the emphasis is upon the legal elements of the offense, not upon the facts of a particular case.

Under the necessarily lesser-included-offense test, the separate crimes need not contain identical elements to constitute the "same offense". *Brown v Ohio, supra.* To be necessarily included in the greater offense, a lesser offense must be such that it is impossible to commit the greater crime without also having committed the lesser. *People v Ora Jones,* 395 Mich 379; 236 NW2d 461 (1975).[21]

For the same reasons that aiding and abetting and conspiracy are different crimes under *Block-*

---

[20] Defendant appears to argue that federal lesser-included-offense analysis is not just limited to necessarily included offenses, but should also preclude multiple punishment for cognate included offenses. However, the United States Supreme Court has not extended the reach of double jeopardy to that extent. See *People v Wilder, supra,* 411 Mich 348, fn 10.

[21] An offense may be necessarily included "logically" in terms of its constituent elements, *Brown v Ohio,* 432 US 161; 97 S Ct 2221; 53 L Ed 2d 187 (1977). Or, it may be "legislatively determined" to be a lesser included offense when specifically so structured by the Legislature. See *Wayne County Prosecutor v Recorder's Court Judge,* 406 Mich 374, 406-407; 280 NW2d 793 (1979) (KAVANAGH, J., *dissenting), app dis sub nom Brintley v Michigan,* 444 US 948; 100 S Ct 418; 63 L Ed 2d 317 (1979). See, also, *People v Wilder, supra,* 411 Mich 342, fn 6.

*burger,* they are different crimes for double jeopardy purposes under a necessarily lesser-included-offense analysis. It is true that the two crimes contain certain common elements, *i.e.,* the participation of more than one person and the shared intent to commit the substantive crime. However, aiding and abetting the commission of a crime and conspiracy to commit that crime are legally distinct offenses. The crux of a conspiracy is an agreement to perpetrate the crime. Conviction of conspiracy does not depend on the success or failure of its object. Further, as defined in Michigan, conspiracy does not require any overt act in furtherance of its illegal end. *People v Atley, supra.*

In contrast, to be convicted as an accessory, one must procure, counsel, aid, or abet the commission of a crime. MCL 767.39; MSA 28.979. Some form of active, overt participation toward the accomplishment of the offense is required, as is a completed crime and a guilty principal. *People v Palmer, supra.*

It is, therefore, possible to commit either crime without necessarily having committed the other. A person may aid and abet the commission of a crime without at the same time having specifically agreed to commit it. It does not automatically follow that when an offense is committed by multiple defendants the action is taken pursuant to a prior arrangement or agreement. Comment, *Conspiracy,* 28 La L Rev 534 (1968). Even if, factually, liability as an accessory is based upon an agreement, it does not require proof of such agreement. *Iannelli v United States,* 777, fn 10. Further, as stated by the United States Supreme Court:

"Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defen-

dant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy." *Pereira v United States,* 347 US 1, 11; 74 S Ct 358; 98 L Ed 435 (1954).[22]

Conversely, a conspirator is not necessarily liable as an accessory to the completed crime on the basis of the agreement alone. To be liable as an accessory, a person must advise, assist, counsel, or induce the commission of the crime. Such behavior may require more than mere agreement. The fact that, in many cases, conspirators do assume an active role in the commission of the object crime does not alter the legal distinction between liability as an accessory and as a conspirator.[23]

Nor is the fact that some of the evidence introduced at trial "may have served double duty", supporting both the conspiracy and accessory charges, material under federal double jeopardy analysis. *Nye & Nissen v United States,* 336 US 613, 619; 69 S Ct 766; 93 L Ed 919 (1949). What is

[22] While the language in *Pereira* seems to indicate that aiding and abetting contemplates a broader range of behavior than does conspiracy, suggestions of the opposite conclusion can also be found. Conspiracy has been described as "an enlargement of, but * * * to be distinguished from, the offense of aiding and abetting the commission of an unlawful act". 15A CJS, Conspiracy, § 35(1), pp 723-724.

[23] Some of the confusion between the distinct legal concepts of conspiracy and aiding and abetting may stem from the fact that in both instances a person may be held liable for acts of another which are reasonably related to the substantive crime. That is, a conspirator is liable for the acts of a co-conspirator taken in furtherance of the conspiracy. By the same token, an accessory is vicariously liable for the reasonably foreseeable acts of the principal. Sometimes the courts have not adequately distinguished between the two sources of liability, seemingly assuming that, for example, entering into the conspiracy is sufficient to prove aiding and abetting and all acts vicariously associated with liability as an accessory. See, *e.g., Pinkerton v United States,* 328 US 640, 648; 66 S Ct 1180; 90 L Ed 1489 (1946) (Rutledge, J., *dissenting in part); Nye & Nissen v United States,* 336 US 613; 69 S Ct 766; 93 L Ed 919 (1949); *Krulewitch v United States,* 336 US 440, 445; 69 S Ct 716; 93 L Ed 790 (1949) (Jackson, J., *concurring); Developments in the Law—Criminal Conspiracy,* 72 Harv L Rev 920 (1959).

critical is that the offenses are legally different, as tested by the *Blockburger* and necessarily included offense rules. Thus, defendant's dual convictions of conspiracy to commit extortion and of aiding and abetting the commission of extortion are not barred by the double jeopardy provision of the United States Constitution.

## C

Michigan, unlike some other states,[24] has its own specific constitutional protection against double jeopardy. Const 1963, art 1, § 15. Although the language of the state provision is nearly the same as that of the federal constitution,[25] there are certain important differences between the state and federal tests used to establish a constitutional violation. Significantly, the Michigan rules offer broader double jeopardy protection than do the federal standards.[26] Thus, the fact that defendant Carter's federal double jeopardy challenge must fail does not preclude this Court from considering whether he has been multiply punished for the same offense under the Michigan Constitution. *People v Jankowski,* 408 Mich 79; 289 NW2d 674 (1980). *Whitton v State,* 479 P2d 302 (Alas, 1970).

As do their federal counterparts, Michigan courts engage in a greater- and lesser-included-offense analysis to evaluate double jeopardy challenges. However, in Michigan the emphasis is not on the theoretical elements of the crimes involved, but rather upon the proof of facts adduced at trial:

[24] See, *e.g., State v Johns,* 184 Conn 369; 439 A2d 1049 (1981).

[25] "No person shall be subject for the same offense to be twice put in jeopardy." Const 1963, art 1, § 15.

[26] Compared to federal interpretations, Michigan is more protective of defendants' double jeopardy rights with respect to multiple prosecution as well as multiple punishment. See *People v White,* 390 Mich 245; 212 NW2d 222 (1973).

"For purposes of the double jeopardy analysis, as a matter of state constitutional law, the question is not whether the challenged lesser offense is by definition necessarily included within the greater offense also charged, but whether, on the facts of the case at issue, it is." *People v Jankowski, supra,* 408 Mich 91.

Of course, in focusing upon the facts, a court must nevertheless still take account of the elements of the offense. *People v Wilder,* 411 Mich 328, 348-349, fn 10; 308 NW2d 112 (1981).

In addition, Michigan has an expansive definition of necessarily included offenses for double jeopardy and other[27] purposes:

"The common-law definition of lesser included offenses is that the lesser must be such that it is impossible to commit the greater without first having committed the lesser. * * * This definition includes only *necessarily* included lesser offenses. This definition, however, is generally conceded to be unduly restrictive, and thus most jurisdictions, including Michigan, have statutes that are broadly construed to permit conviction of 'cognate' or allied offenses of the same nature, under a sufficient charge. These lesser offenses are related and hence 'cognate' in the sense that they share several elements, and are of the same class or category, but may contain some elements not found in the higher offense." (Citation omitted.) *People v Ora Jones,* 395 Mich 379, 387; 236 NW2d 461 (1975).

The fact that a lesser offense contains an element not also contained in the greater does not necessarily preclude the lesser from being included within the greater. The major factor is notice to the defendant; if the relation between the lesser

[27] For example, in *People v Ora Jones,* 395 Mich 379; 236 NW2d 461 (1975), this Court held that a trial judge's refusal to give a requested instruction on a lesser included offense supported by the evidence was reversible error.

offense and that originally charged is close enough to fairly inform the defendant that he will be required to defend against it, the lesser offense may be included within the greater. Further, cognate offenses include common statutory purposes as well as common elements; and, the shared elements must be related to those purposes, *i.e.,* "coincide in the harm to the societal interest to be protected". *Ora Jones,* p 390.

Thus, in contrast to the test used in the federal system, the Michigan test for double jeopardy focuses on the facts of the particular case and proscribes multiple convictions of cognate as well as necessarily included offenses.

The Michigan analysis has been applied by this Court to preclude dual convictions of possession and delivery of the same heroin, where the possession was necessarily incident to delivery. *People v Martin,* 398 Mich 303; 247 NW2d 303 (1976).

Reaching the same conclusion with respect to the sale and possession of the identical heroin in *People v Stewart (On Rehearing),* 400 Mich 540, 548-549; 256 NW2d 31 (1977), we explained:

"[P]ossession and sale of narcotics are separate crimes which may be separately charged. * * * In a given case, sale may be found without possession. Likewise, possession may be determined without sale. However, depending upon the facts developed at trial, when the circumstance of possession is not severable or apart from a sale and the jury concludes the defendant is guilty of sale, then the possession blends together with the sale so as to constitute one single wrongful act.

"Therefore, from the evidence adduced at this trial, the illegal possession of heroin was obviously a lesser included offense of the illegal sale of heroin. When the jury *in the case at bar* found the defendant guilty of the illegal sale of this heroin, they necessarily found him guilty of possession of the same heroin.

* * *

"Defendant Stewart may not be 'doubly punished' by convicting him of possession, which in *this* case was a 'necessary' prerequisite or the *sine qua non* for the very sale for which he was also convicted."[28] (Citation omitted.)

This Court has also held that multiple convictions of armed robbery, larceny in a building, and larceny over $100, all arising from the same taking, violate double jeopardy. *People v Jankowski, supra.*[29] Finally, in *People v Wilder, supra,* 411 Mich 342, we held that conviction and sentence for both first-degree felony murder and the underlying felony also contravened the state constitutional provision, because in that case "the evidence needed to prove first-degree felony murder require[d] proof of the underlying lesser included felony".

In the instant case, defendant Carter contends

---

[28] Both *Martin* and *Stewart* relied on statements and reasoning in *State v Allen,* 292 A2d 167, 172 (Me, 1972):

"It is elementary that the State cannot divide a single offense into several parts according to time and conduct and base separate prosecutions upon and impose separate punishments for the various necessary divisions of that single crime.

"The possession of narcotic drugs is an offense distinct from the sale thereof. But in the instant case the possession and sale clearly constituted one single and same act. The possession, as legally defined, is necessarily a constituent part of the sale, as legally defined. Where the only possession of the narcotic drug is that incident to and necessary for the sale thereof, and it does not appear that there was possession before or after and apart from such sale, the State cannot fragment the accused's involvement into separate and distinct acts or transactions to obtain multiple convictions, and separate convictions under such circumstances will not stand. The error is not cured by the fact the trial court permitted the two sentences to run concurrently. The conviction and sentence upon the charge of possession must be set aside." (Citations omitted.)

[29] In *Jankowski,* defendant was convicted of the substantive counts on an aiding and abetting theory. He was also convicted of conspiracy to commit armed robbery, one of the substantive charges. This Court did not grant leave to appeal the propriety of the conspiracy conviction.

that his dual convictions violate double jeopardy in that the two crimes are cognate-included offenses. Further, he argues, the facts introduced at trial to demonstrate aiding and abetting necessarily proved the crime of conspiracy and vice versa, *i.e.,* the facts used to show conspiracy required the jury to find aiding and abetting.

We disagree. Initially we note that aiding and abetting the commission of extortion and conspiracy to commit extortion do not satisfy the definition of cognate offenses set forth in *Ora Jones, supra.* Although both crimes involve concerted activity, the offenses are not of the same class or category. Nor do they appear to reflect a common statutory purpose. The conspiracy statute punishes the planning of the offense and focuses upon the alleged "special dangers" resulting from group action. On the other hand, the aiding and abetting statute punishes the actual commission of the crime.

In addition, on the facts of this case, neither crime was *necessarily* included within the other. Neither was a " 'necessary' prerequisite or the *sine qua non"* of the other. *Stewart,* p 549. And, proof of either crime did not *necessarily require* a finding of the other.

In applying the Michigan "factual" double jeopardy test, it is critical to recognize the distinction between what a jury could or did conclude from the evidence and what a jury *necessarily* found. Thus, in the instant case, when the jury found the defendant guilty of aiding and abetting Kimble in the commission of extortion, it did not thereby find sufficient facts to find him guilty of conspiracy. To convict Carter on the aiding and abetting charge, the jury was required to find that he actively participated in the joint venture and that he

shared Kimble's intent to commit the crime. Carter's participation in the crime was demonstrated at trial by testimony that he had composed the threatening letter in Kimble's room at the Sewell Hotel, met Kimble after the robbery, and divided the money. However, these facts do not necessarily presuppose or establish an agreement to commit the extortion, the indispensable element of conspiracy. Establishing the agreement required a completely separate inference, or a separate factual finding. Further, unlike the situation in *Martin* and *Stewart,* where the delivery and sale could not have taken place without the possession, in the instant case, the aiding and abetting could have occurred without the conspiracy.

By the same token, the jury was not required to find defendant guilty of aiding and abetting the extortion based on proof that he conspired with Kimble to commit it. Certainly the aiding and abetting was not a "necessary prerequisite or the *sine qua non*" of the conspiracy. In addition, proof of the conspiracy in this case was not sufficient to establish aiding and abetting. Even if the jury used the same facts as a starting point for finding defendant guilty of both charges, an additional fact is required to support a conviction of aiding and abetting, *i.e.,* evidence of the completed crime. In that sense, the instant case differs significantly from other cases in which this Court has found double jeopardy violations. In *Martin* and *Stewart,* once the delivery and sale were found, the possession was established without further proof. On the facts in *Jankowski,* when the jury found that the defendant had committed the taking which constituted an element of the armed robbery, the jury necessarily found, without additional evidence, the facts sufficient to convict on the larceny charges.

In *Wilder,* proof of first-degree felony murder necessarily established the underlying felony of armed robbery.

Finally, the factual pattern in the instant case may have allowed the jury to convict defendant of both crimes on the basis of completely different facts. Edward Kimble testified that he met with defendant Carter on two different occasions on December 18, the day before the robbery. According to Kimble, he and Carter discussed the "Consumers Power job" on the afternoon of December 18.[30] That evening, they met again to compose the extortion note. The jury could have believed Kimble's entire testimony, and concluded that the agreement was consummated in the first meeting, making the crime of conspiracy complete. It could then have found the more active participation required for liability as an accessory in the events of the evening meeting at the Sewell Hotel.

In sum, it was both factually and logically *possible* for defendant to be guilty of either crime in the case—aiding and abetting the commission of extortion and conspiracy to commit extortion— without at the same time being guilty of the other. *Cf. Jankowski.* These crimes are factually and theoretically independent; they are neither inseparably intertwined, *cf. Stewart,* nor merely alter-

---

[30] Admittedly, Kimble's testimony regarding the afternoon meeting is slightly contradictory:

"*Q. [By Mr. Jacobs, prosecutor]:* Had you discussed what you were going to do at Consumers with anyone previous to going in there?

"*A.* No. No.

"*Q.* Did you talk about it the night before?

"*A.* We talked it—we talked about it the afternoon before.

"*Q.* The afternoon before?

"*A.* Uh-huh.

"*Q.* And you and who, sir?

"*A.* Myself and Mr. Carter.

"*Q.* And Mr. Carter?

"*A.* Yeah."

native routes for creating liability for the substantive crime.[31] Neither crime necessarily supplies an indispensable element of the other. *Cf. Wilder.*

"[C]onspiracy may be an evil in itself, [independent] of any other evil it seeks to accomplish." *Dennis v United States,* 341 US 494, 573; 71 S Ct 857; 95 L Ed 1137 (1951) (Jackson, J., *concurring).* In the instant case, this statement describes the facts as well as the law.[32] Thus, defendant's "factual" double jeopardy challenge to his dual convictions must be rejected.[33]

## III

In a further challenge to his conviction, defendant contends that the trial court erred in refusing to grant a new trial, despite the prosecutor's failure to indorse and produce a res gestae witness.

Edward Kimble was arrested as a result of information supplied to the police by Lawrence

---

[31] *Cf.* Wis Stat Ann § 939.05, whereby the Legislature has specifically defined conspiracy and aiding and abetting as alternate theories of party liability.

[32] In a footnote in his brief in this Court, defendant argues that because "aiding and abetting are but alternative ways of describing the same conduct", the rule of lenity requires reversal of his convictions. The rule of lenity, grounded in due process, is a basic policy that any doubt in the enforcement of a criminal statute will be resolved in a defendant's favor, *i.e.,* against the imposition of a harsher punishment or against "turning a single transaction into multiple offenses". *Bell v United States,* 349 US 81, 84; 75 S Ct 620; 99 L Ed 905 (1955). Because we do not agree with defendant's premise, we need not decide the effect of the rule of lenity in this case. Conspiracy and aiding and abetting are not alternative means of referring to the same behavior. As has been discussed, conspiracy goes to the planning, and aiding and abetting the commission, of the substantive offense. Further, as we have held, the two crimes are different offenses, both in terms of their definitional elements and, in particular cases such as the instant one, the proofs adduced at trial.

[33] Another panel of the Court of Appeals, in addition to that in the instant case, has reached a similar result. See *People v Hamp,* 110 Mich App 92; 312 NW2d 175 (1981).

Morris, the manager of the J. C. Penney store located across the street from the Consumers Power office. According to Morris's affidavit filed in support of defendant's motion for a new trial, and also his testimony at the evidentiary hearing[34] to consider that motion, on two different occasions prior to December 19, 1975, he noticed a black male standing in the lobby between the inside and outside doors of his store, staring at the Consumers Power building. On each occasion, the man stayed for 10 or 15 mintues before leaving.

Morris stated further that on the morning of December 19, he again saw the same black male come into the lobby and watch the building across the street for approximately 15 minutes. Morris testified that he went out to lunch at 11 a.m. on that day, and did not return to his store until after the robbery had occurred. When the same black male, subsequently identified as Edward Kimble, appeared in the store the day after the robbery, Morris called the police, who made the arrest.

In his affidavit, Morris explained that he had noticed this particular black male because he was afraid that the man might be planning to rob the J. C. Penney store. On all three occasions, the man appeared to be alone.

Before trial, defense counsel filed a general demand for exculpatory evidence. He subsequently filed several specific motions for discovery, and received the particular evidence requested.[35]

---

[34] The evidentiary hearing was held in accordance with the guidelines set forth in *People v Robinson,* 390 Mich 629; 213 NW2d 106 (1973). At such a hearing, the prosecution has the burden of explaining why the witness was not indorsed and produced at trial.

[35] In this manner, upon order of the court, he received the statements made to the police by Diane Potter and Edward Kimble.

Larry Morris was not called to testify at trial. Defense counsel first learned of his existence when he reviewed the presentence report following defendant's trial and conviction.

In denying defendant's motion for a new trial, the trial judge ruled that Morris was not a res gestae witness, and that further, in view of the "very persuasive" evidence of defendant's guilt, the failure of the jury to hear his testimony did not affect the outcome at trial.

The people have an affirmative duty to indorse and produce at trial all res gestae witnesses. MCL 767.40; MSA 28.980. While no precise definition of the term has been developed, a res gestae witness has been loosely described as "an eyewitness to some event in the continuum of a criminal transaction and [one] whose testimony will aid in developing a full disclosure of the facts surrounding the alleged commission of the charged offense". *People v Hadley,* 67 Mich App 688, 690; 242 NW2d 32 (1976).

The defendant argues that Morris's testimony would "aid in developing a full disclosure of the facts" by contradicting Edward Kimble's testimony in two important respects. First, Kimble indicated, in essence, that the conspiracy began on the afternoon of December 18, when he and Carter discussed the Consumers Power job. However, Morris's statements reveal that some time *before* that date, Kimble was seen staring at the Consumers Power building from across the street. Second, Kimble testified that "one day" he and Carter surveyed the proposed scene of the crime from the sidewalk. Morris's testimony would indicate that, on the contrary, Kimble engaged in such activities

not with Carter, but by himself. Thus, defendant concludes, Morris is a witness who can attest to a crucial fact, *i.e.,* the fact that Carter was not present during the surveillance.

We disagree. Morris's statements do not necessarily contradict the prosecutor's case. The fact that Morris saw only Kimble does not require the conclusion that Kimble was surveying the robbery scene alone. Carter could have easily been present, outside Morris's range of vision. Further, the fact Kimble may have been seen near the Consumers Power office *before* December 18 is not relevant to any involvement of Carter in the conspiracy.

More importantly, even in terms of the "continuum of the criminal transaction", Morris is simply too far removed from the criminal event to be denominated a res gestae witness. Morris was not an eyewitness to the crime; moreover, he never even saw the defendant until approximately two years after the crime. In those cases in which individuals were found to be res gestae witnesses in spite of the fact that they did not observe the actual commission of the crime, the connection between what was observed and the criminal event was much closer than in the instant case. In *People v Hadley, supra,* the witness observed the defendant, a suspicious-looking person, in a parking lot just a few minutes before the defendant broke into an automobile. The witness's phone call led directly to the defendant's arrest, and the court found that he qualified as a res gestae witness.

Defendant challenges the prosecutor's failure to indorse and produce Larry Morris from another perspective. He argues that the people's nondisclo-

sure of the existence and identity of the witness in the face of a general request for exculpatory material constituted a denial of a fair trial.

Because the government's ability to investigate and uncover information is superior to the defendant's, the adversary process has been somewhat modified in the criminal trial context. Focusing upon the unfairness of this disparity and also upon the affirmative duty of the prosecution to ensure that a trial is directed toward fair ascertainment of the truth,[36] the United States Supreme Court has held that a defendant has a due process right of access to certain information possessed by the prosecution. The prosecution may not suppress evidence requested by the defendant where the evidence is favorable to the accused and material to his guilt or punishment. *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

In *United States v Agurs,* 427 US 97, 103-104; 96 S Ct 2392; 49 L Ed 2d 342 (1976), the Court further detailed the standard for prosecutorial disclosure. It identified three different situations in which a defendant's due process right to discovery may be implicated. In the first situation, where the prosecutor knowingly uses perjured testimony, the failure to reveal the perjury mandates reversal of a conviction "if there is any reasonable likelihood

---

[36] Michigan courts have consistently stressed the prosecutor's duty to present all relevant evidence, whether inculpatory or exculpatory. In *People v Dellabonda,* 265 Mich 486, 500-501; 251 NW 594 (1933), this Court described that duty:

"The only legitimate object of the prosecution is to show the whole transaction as it was, whether its tendency is to establish the guilt or innocence of the accused. A public prosecutor has no right to suppress testimony. It is the duty of the prosecuting attorney to furnish all the evidence within his power bearing upon the issue of guilt or innocence in relation to the main issue or to give some good excuse for not doing so." (Citations omitted.)

that the false testimony could have affected the judgment of the jury". In the second type of situation, illustrated by *Brady, supra,* where a specific request for a piece of evidence is made, the test for reversal is whether "the suppressed evidence might have affected the outcome of the trial". (Footnote omitted.)

Quite often, however, as in the instant case, a third type of situation occurs: the defendant has no knowledge of exculpatory material possessed by the prosecutor, and, therefore, cannot make a specific request. In these circumstances, where defendant can only make a general request for exculpatory information, or, in fact makes no request at all,[37] the standard for what is in effect a voluntary disclosure is more difficult to meet:

"[T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Agurs,* p 108.

The specific test for determining when a prosecutor must reveal exculpatory evidence in this

[37] The *Agurs* Court held that the general request of the type made by the defendant in the instant case is the functional equivalent of no request at all:

"Such a request really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all." 427 US 106-107.

situation is governed by the standard of materiality enunciated in *Agurs:*

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. *It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.* This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." (Footnotes omitted.) *Agurs,* pp 112-113.

Applying the *Agurs* test, the trial judge held that, given the overwhelming evidence of defendant's guilt, Larry Morris's testimony was not sufficient to create a reasonable doubt regarding that guilt.

We agree. The evidence implicating defendant in the crime was direct and persuasive. The testimony of the victim, describing her friendship with Carter and his knowledge of facts about her family reflected in the extortion note, *i.e.,* that she had three sons, helped connect him with the crime in a manner which corroborated the testimony of Kimble and Potter. Further, for the reasons noted above, the evidence contained in Morris's statements would not necessarily have contradicted the other evidence presented against the defendant. The omitted evidence, Morris's testimony, would not have served "to create a reasonable doubt that did not otherwise exist". The prosecution, therefore, was under no duty to disclose his identity.

IV

Defendant was arrested approximately three weeks after the robbery, when he was identified by Diane Potter from a photograph. Defendant challenges the photographic identification procedure as impermissibly suggestive and argues further that there was no independent basis for her identification of defendant at trial.

A *Wade*[38] hearing was held to consider this issue prior to trial. At the hearing, Detective Michael Rand, the investigating officer, testified that he showed Potter a total of approximately 200 photographs on three or four different occasions. At the first showup, held the day after the robbery, she selected the photograph of a person who had been in prison at the time of the crime. At the last photographic lineup, held nearly three weeks later, Potter picked out defendant's picture. Officer Rand testified that the witness stopped at Carter's picture, which was the third one in the pack, and did not look at the remaining photographs. This testimony was contradicted by Potter, who stated that she went through the entire pack twice before identifying defendant.

Diane Potter testified that she had given the police an independent description of defendant before viewing the photographs. He was depicted as clean-shaven, about six feet tall with a sturdy build, hair in tight circles, "buggy eyes", and flared nostrils. Although she remembered him as clean-shaven both in person and in his photograph, in fact defendant, both in person and as pictured, had a mustache and a goatee.

---

[38] *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

Potter testified, somewhat equivocally, that just before the final showup, Officer Rand mentioned that he had a particular suspect in mind, and that she should look over the photographs very closely. After she picked out defendant's picture, he confirmed that she had selected the right person. Detective Rand, on the other hand, stated that he could not recall making any such comment to Potter at the showup in question.

The trial judge concluded that Potter, having testified that she had seen Carter several times at Leake's Lounge and the Sewell Hotel, had an independent basis for her identification of Carter. He also held that the photographic identification procedure was "fair under the circumstances".

Defendant challenges both conclusions. He argues that Detective Rand's statements to Potter revealing that he had focused on a particular suspect and that she had selected the proper photograph rendered the procedure impermissibly suggestive and tainted her identification at trial.

It is true that comments such as those allegedly made by Detective Rand may lead to error in a photographic identification procedure:

> "The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." (Footnotes omitted.) *Simmons v United States,* 390 US 377, 383; 88 S Ct 967; 19 L Ed 2d 1247 (1968).

This Court has also recognized the impropriety of this behavior:

"Improper suggestion commonly comes about because of three things. *First, the witness when called by the police or prosecution either is told or believes that the police have apprehended the right person.* Second, if the witness is shown only one person or a group in which one person is singled out in some way, he is tempted to presume that he is the person. Third, as the second factor just discussed above shows, eyewitness identification has inherent weaknesses from the standpoint of the witness's problems of sensation, retention, etc., and the similarity in appearance of people." *People v Anderson,* 389 Mich 155, 178; 205 NW2d 461 (1973). (Emphasis added.)

The great danger of an improper procedure is that an initial misidentification may unduly influence any subsequent identification. Thus, a courtroom identification may be made on the basis of the initial photographic showup or corporeal lineup rather than from an independent recollection of the crime. *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); *People v Anderson, supra.*

To guard against this possibility, if a pretrial identification has been improperly conducted, an independent basis for any in-court identification must be established. In *People v Kachar,* 400 Mich 78, 95-96; 252 NW2d 807 (1977), this Court set forth the criteria to be used to determine whether such an independent basis exists:

"1. Prior relationship with or knowledge of the defendant.

"2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factor affecting sensory perception and proximity to the alleged criminal act.

"3. Length of time between the offense and the disputed identification. * * *.

"4. Accuracy or discrepancies in the pre-lineup or showup description and defendant's actual description.

"5. Any previous proper identification or failure to identify the defendant.

"6. Any identification prior to lineup or showup of another person as defendant.

"7. [T]he nature of the alleged offense and the physical and psychological state of the victim.

\* \* \*

"8. Any idiosyncratic or special features of defendant."[39]

We agree with the trial judge that the photographic identification procedure used in this case was not impermissibly suggestive. First, it is less than clear that the allegedly improper remarks even took place. Not only was Diane Potter's testimony contradicted by Officer Rand's, but also it was somewhat inconsistent in itself. At one point in the pretrial hearing, she stated that she was not positive that the officer had said anything *before* showing her the photographs. Second, even if Officer Rand did indicate that he had a suspect in mind, he in no way indicated who that suspect was until after Potter unequivocally identified the defendant. Finally, any inconsistencies in Potter's testimony and identification relate more directly to her credibility as a witness than to the alleged suggestiveness of the procedure.

In addition, application of the relevant *Kachar* criteria reveals that there was a sufficient independent basis for Diane Potter's identification of Alvin Carter. She had a prior knowledge of the defendant, having seen him on at least six occasions

---

[39] The lead opinion in *Kachar* was signed by only two justices, with one concurring in result. One justice dissented on the issue of whether the initial showup was impermissibly suggestive. Three others did not participate in the decision.

prior to the crime. The quality of the circumstances in which she observed him is also more likely to give rise to reliable identification than the emotional circumstances in which a victim views a suspect while the crime is taking place.

Further, although Potter erroneously described defendant as clean-shaven, she did accurately focus on a number of defendant's idiosyncratic features, such as his "buggy" eyes and flared nostrils. And, in spite of her initial selection of the wrong photograph, when confronted with defendant's picture, Potter's identification was clear and unequivocal.

Under the totality of the circumstances, therefore, we hold that Potter's in-court identification was supported by a more than adequate independent basis. The trial judge properly allowed this evidence at trial.

## V

At trial, Kimble testified that he had first met defendant in prison, where Carter was a guard and Kimble a prisoner. Defendant then called witnesses to establish that defendant and Kimble were assigned to different units of the prison and would have had no contact with each other. One of the witnesses testified from personnel records that Carter had been employed in the trusty division until he was dismissed. On cross-examination, the prosecutor inquired as to the reason for the dismissal. Over defense counsel's objection, the witness was permitted to respond that defendant had been fired for assaulting his supervisor. The trial court allowed the testimony on the theory that the defense had opened the door by bringing in the employment records.

At the conclusion of the witness's testimony, the trial court, *sua sponte,* gave a cautionary instruction:

"Jurors, I want to make a cautionary instruction at this time. I've allowed the prosecutor to go into the records because the defendant produced them himself, and I thought it was only fair that he do so; however, I want to caution you at this time that you're not to consider anything concerning what was testified to in reference to any suspension or dismissal in determining whether he is guilty or innocent of this charge. It would be error for you to do so. So, don't consider anything about that in reference as to whether he committed the offenses that he's on trial here for."

After this instruction was given, there was no further objection.

Defendant argues that the trial court erred in allowing the testimony. Evidence that a defendant has committed another crime or offense is generally inadmissible on the issue of his guilt of the charged offense. *People v DerMartzex,* 390 Mich 410; 213 NW2d 97 (1973). The purpose of the rule is to guard against convicting an accused on the theory that he is a "bad man". The probative value of such evidence is often outweighed by its prejudicial effect. *DerMartzex, supra.*

Under the facts of this case, we find that any error that may have occurred was cured by the cautionary instruction. See *People v Richardson,* 239 Mich 695; 214 NW 965 (1927); *People v Page,* 198 Mich 524; 165 NW 755 (1917). The instruction immediately followed the objectionable testimony, and the only further reference to defendant's discharge by either party was defendant's testimony that he had been reinstated with back pay after an investigation of the incident. Thus, we find this issue to be without merit.

## VI

Accordingly, we affirm defendant's conviction of aiding and abetting the commission of extortion and conspiracy to commit extortion.

The Court of Appeals is affirmed.

FITZGERALD, C.J., and WILLIAMS, COLEMAN, and RYAN, JJ., concurred.

KAVANAGH, J. *(for reversal of conspiracy conviction).* I would affirm defendant's conviction of extortion, but would set aside his conviction of conspiracy to perpetrate extortion.

Nothing was added to the extortion by the "conspiracy" to effect it. When the extortion was carried out the charged conspiracy merged into the completed act.

LEVIN, J., concurred with KAVANAGH, J.

RILEY, J., took no part in the decision of this case.