**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0767n.06

No. 09-1229

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Dec 16, 2010**

LEONARD GREEN, Clerk

WILLIE JAMES JONES,                    )
                                        )
    **Petitioner-Appellant,**        )        **ON APPEAL** FROM THE
                                        )        UNITED STATES DISTRICT
v.                                      )        COURT FOR THE EASTERN
                                        )        DISTRICT OF MICHIGAN
SHIRLEE HARRY,                          )
                                        )
    **Respondent-Appellee.**         )        **O P I N I O N**
_____ )

**Before: MOORE, SUTTON, and McKEAGUE, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** A Michigan jury convicted Willie James

Jones of second-degree murder, as well as both conspiracy to commit and solicitation to commit

first-degree murder. The district court denied Jones's habeas petition on all grounds, but issued a

certificate of appealability on three claims: Jones's trial counsel was ineffective because she opened

the door to previously excluded testimony; Jones's multiple punishments for the same actions placed

him in double jeopardy; and inadequate evidence supported his convictions. For the reasons

explained below, we **AFFIRM**.

**I. BACKGROUND**

**A. Substantive Facts**

On February 17, 2001, Kenneth Flowers (Flowers) was murdered by a man who has never

been identified. The shooter asked Flowers's brother if he was Flowers, and when the brother said

no, the shooter departed. Soon the shooter returned, asked Flowers "What's up?" and fatally shot Flowers. R. 16 (06/16/03 Trial Tr., Dequan Flowers at 159–61). Flowers's mother, Emma Flowers, and her neighbor, Lucretia Adams (Adams), told an officer that they suspected Willie James Jones, whom they knew by the nickname "Nookie."

McLister Trice was the link between Flowers and Jones. She had dated and had a child with Jones, and dated Flowers from October 2000 to January 2001. After breaking up with Flowers three weeks before the murder, Trice filed several police reports about Flowers vandalizing her car and stalking her. She also obtained a personal protective order against him. Tensions escalated in early February 2001, when Flowers followed Trice into a liquor store. Jones was with Trice, and an argument ensued. Flowers struck Trice's head, and in return Trice hit Flowers with a wine bottle. Flowers ran from the store and told his companion, Jeff Adams, that Flowers had punched Jones and that Jones had a gun. Jeff Adams testified to these facts, though he had not witnessed the fight. Trice, however, insisted that Jones was not involved and did not have a gun.

Around 10 a.m. on the morning of the shooting, Trice drove to the home of her stepmother, Patricia Wilson. Flowers, who lived across the street, approached Trice's car and punched her window. Adams testified that she overheard Trice tell Flowers "B----, you going to die today. Nook -- my baby daddy Nook is setting it up now." R. 17 (06/17/03 Trial Tr., Adams at 113). Emma Flowers's testimony was substantially similar. *Id.* (E. Flowers at 132) ("'B----, you going to die today. My baby daddy Nook is out making arrangements for you to be killed.'"). Trice denied making these statements, and Jones denied telling Trice that he planned to kill Flowers.

Afterward, Trice called her stepmother, Patricia Wilson. Wilson later testified that Trice told her about the incident with Flowers and "that Nook was going to take care of it that day." *Id.* (Wilson at 103).

Around noon, Jones stopped by Trice's workplace. Trice told Jones and other people about the encounter with Flowers. Around 4 p.m., Jones called Trice to say that "[t]he order had been taken care of." *Id.* (Trice at 40). Trice responded "[d]on't go over there bothering him," but Jones said "I paid the n-----." *Id.* at 40, 45. Three hours later and after the shooting, Jones visited Trice at work again. Trice asked Jones whether he had "anything to do with it." *Id.* at 44. Jones seemed to be drinking and his response was ambiguous: "[w]hat you thought." *Id.*

## B. Procedure

Before Jones's trial, the trial court excluded testimony from Emma Flowers and Adams about Trice's statement ("you going to die today; Nook is setting it up now") because it appeared to be double hearsay, lack foundation, and might fall outside of Michigan's then-existing state-of-mind exception to the hearsay prohibition. The trial court withheld judgment on whether the evidence could be introduced to impeach Trice. The court also excluded Wilson's testimony that Trice had told her that Jones would take care of Trice's problem with Flowers.

The evidentiary issue reemerged at trial. On direct examination, Trice could not recall the time at which she spoke to Jones. The government referenced a statement that Trice had given to police after the shooting when she had been arrested for her own alleged involvement. The government offered the statement to Trice to refresh her recollection. Trice then testified that, at 4

3

p.m., Jones had said "[t]he order had been taken care of" and "[h]e already paid someone." *Id.* at 40. The government asked whether Trice had said anything to Flowers that morning, but the judge sent the jury away before Trice answered. The judge informed the government's counsel that it would not permit questioning on an irrelevant point as a means of creating an innocuous inconsistency from which to introduce Emma Flowers's and Adams's statements "under the guise of impeachment." *Id.* at 47. The judge then cautioned the defense attorney to constrain her questions to avoid "open[ing] the door for the admission . . . of the heretofore barred . . . statements." *Id.* at 56–57.

On cross-examination, Trice claimed that she did not know what Jones was talking about when he mentioned paying someone to take care of an order. Defense counsel also asked a series of questions to undermine the credibility of Trice's statement to the police: she had been arrested, was poorly treated, did not write the statement herself, and signed it while scared, threatened, and hungry. Based on this latter set of questions, the trial court ruled that defense counsel had opened the door to the hearsay statements, permitting the government to rehabilitate Trice with her consistent, pre-arrest statements. Wilson, Emma Flowers, and Adams testified to the statements "that Nook was going to take care of it that day," *id.* (Wilson at 103), and "[b]----, you going to die today. Nook -- my baby daddy Nook is setting it up now," *id.* (Adams at 113); *see also id.* (E. Flowers at 132). Defense counsel objected specifically to Adams's testimony but the judge admitted it both as a prior consistent statement and for impeachment. The attorney did not request a limiting instruction.

4

The jury convicted Jones of second-degree murder, conspiracy to commit first-degree murder, and solicitation of first-degree murder. He is serving concurrent sentences of life imprisonment for conspiracy, nineteen-to-thirty years of imprisonment for second-degree murder, and nineteen-to-thirty years of imprisonment for solicitation of first-degree murder. The Michigan Court of Appeals affirmed the convictions, *People v. Jones*, No. 250326, 2005 WL 657578 (Mich. Ct. App. March 22, 2005) (unpublished opinion), and the Michigan Supreme Court declined leave to appeal. Following his direct appeal, Jones filed his habeas petition with the district court. The district court denied relief but granted a certificate of appealability on the three issues that are now before this court: ineffective assistance of trial counsel, multiple punishments in violation of the Double Jeopardy Clause, and sufficiency of the evidence. *Jones v. Harry*, No. 06-13465, 2009 WL 275728 (E.D. Mich. 2009) (unpublished opinion).

## II. ANALYSIS

### A. Standard of Review

"In a habeas corpus proceeding, this Court reviews a district court's legal conclusions *de novo* and its factual findings for clear error." *Goff v. Bagley*, 601 F.3d 445, 455 (6th Cir. 2010) (quotation omitted).

Michigan state courts adjudicated the merits of Jones's claims, and the Antiterrorism and Effective Death Penalty Act (AEDPA) applies. As a result, we can afford relief on the ineffective-assistance and double-jeopardy claims only if the Michigan decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States." 28 U.S.C. § 2254(d)(1). As to the sufficiency of the evidence, we review the Michigan decision to see if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

## B. Ineffective Assistance of Counsel

Jones challenges the assistance of his trial counsel on two bases. First, he asserts that his attorney provided ineffective assistance by opening the door for Trice's prior statements to come into evidence by discrediting Trice's statement to the police, even though her statement to the police was not actually admitted into evidence. Second, he complains that his attorney did not request that the judge instruct the jury to consider Wilson's, Adams's, and Emma Flowers's testimony only for its impeachment value. To succeed on his ineffective-assistance claim, Jones must show that the state courts unreasonably applied *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires both deficient performance and prejudice to the defense. Attorney performance is deficient if "counsel's representation fell below an objective standard of reasonableness" by making "errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687–88. "Our review of counsel's performance is highly deferential and counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Johnson v. Bell*, 525 F.3d 466, 487 (6th Cir. 2008) (internal quotation marks omitted).

### 1. Opening the Door For Prejudicial Hearsay

Opening the door to damaging testimony can constitute deficient performance. *See, e.g.,* *White v. Thaler*, 610 F.3d 890, 900 (5th Cir. 2010). Here, however, the Michigan Court of Appeals found that opening the door was a necessary consequence of the defense's much-needed attack on Trice's credibility. That consequence was damaging, but we consider it in context, alongside the beneficial results of the strategy and in light of counsel's slim options. *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (using "a context-dependent consideration of the challenged [attorney] conduct").

On direct examination, Trice had testified to Jones's statements that "[t]he order had been taken care of," "[h]e already paid someone," and he had done "[w]hat you thought." R. 17 (06/17/03 Trial Tr., Trice at 40, 44). Although Trice's police statement had not been admitted into evidence, the jury was aware of her statement to police because the prosecution had referenced it when refreshing Trice's recollection. Jones admits that direct examination implied that the police report was consistent with Trice's statements. Doing nothing to counter these damaging claims and implications on cross-examination would not have been a wise choice, despite what Jones argues now. The Michigan Court of Appeals did not unreasonably determine that, "[b]ecause of the nature of [Trice's statements on direct], defense counsel would have been remiss not to address the statements on cross-examination and attempt to explain them." *Jones*, 2005 WL 657578, at *3.

Debunking the police report removed any enhanced credibility that the police report had added to Trice's testimony. Jones argues that his attorney performed deficiently because she acted

on the false belief that the police report was in evidence. But his attorney explicitly confirmed her understanding that the statement was not in evidence. R. 17 at 79 ("THE COURT: 'You know, her statement is actually not in evidence, [defense counsel]. Her trial testimony is.' [DEFENSE COUNSEL]: 'I understand.'"). Defense counsel's cross-examination was directed at "what the prosecutor said when he was asking [Trice] questions. He asked about her [police] statement, what she said in her statement." *Id.*

Some portions of the cross-examination strategy did not depend on the police report. For example, the defense attorney extracted from Trice that she did not know what Jones was talking about when he referenced the order that he had taken care of or when he said that he had paid someone. The judge had warned the defense attorney about the risk of opening the door to previously excluded testimony. In hindsight, perhaps refraining from asking about the police report would have been a better strategy. But given the deference with which we review attorney decisions, we cannot say that the state courts were unreasonable in concluding that the choice was not constitutionally deficient. The circumstances of the police report—Trice's own arrest as well as her maltreatment—make her statements dubious. That line of questioning may have had more force than did Trice's admission that she felt that Jones's statements were ambiguous. Also, each of the hearsay statements relies on Trice's credibility as a declarant. Jones's trial counsel reasonably might have decided that the benefit of casting doubt on Trice's testimony outweighed the harm of new witnesses testifying to statements similar to what that the jury had already heard.

The Michigan Court of Appeals held that "[c]ounsel's strategy was clearly to try to show that Trice did not know what defendant meant by the statements. Given counsel's limited options, this strategy was not unsound." *Jones*, 2005 WL 657578, at *3. The attorney's strategy was somewhat broader in that it probed the circumstances of the police report, but the state court was not unreasonable in determining that the attorney exercised professional judgment and provided constitutionally adequate assistance. Thus, Jones cannot demonstrate ineffective assistance of counsel.

### 2. Failing to Request A Limiting Instruction

Although Jones briefs the issue on appeal, his habeas petition does not allege that trial counsel's performance was deficient for failing to request a limiting instruction for the testimony of Wilson, Emma Flowers, or Adams. While the claim bears some resemblance to his first ineffective-assistance claim, his petition did not fairly raise the issue of limiting instructions. We therefore may not review the claim. *See Seymour v. Walker*, 224 F.3d 542, 561 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001).

## C. Double Jeopardy

The Fifth Amendment ensures that no one may "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. That clause protects criminal defendants from prosecution following conviction or acquittal for the same offense, and also prohibits infliction of "multiple punishments for the same offense imposed in a single proceeding." *Jones v. Thomas*, 491 U.S. 376, 381 (1989) (internal quotation marks omitted). "With respect to cumulative sentences

imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). In fact, "the Court has never held or intimated that the constitutional bar against double jeopardy circumscribes the legislative prerogative to define crimes and prescribe punishment in the context of a single prosecution." *White v. Howes*, 586 F.3d 1025, 1032 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 3370 (2010). "Even if the crimes are the same under *Blockburger* [*v. United States*, 284 U.S. 299 (1932)], if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." *Ohio v. Johnson*, 467 U.S. 493, 499 n.8 (1984); *see also White*, 586 F.3d at 1032 (denying habeas even though the panel "agree[d] . . . that the two statutes at issue . . . punish the same offense under *Blockburger*").

We owe the Michigan courts deference even if, as seems to be the case, Jones's appeal was the first time that they ruled on the issue. Because "the only question for the [Michigan] Court of Appeals was what the legislature had intended," any error in its reasoning "is purely a matter of state law." *McCloud v. Deppisch*, 409 F.3d 869, 874 (7th Cir.), *cert. denied*, 546 U.S. 1063 (2005); *see also Banner v. Davis*, 886 F.2d 777, 782 (6th Cir. 1989) (holding that we may not "independently evaluate the scope of the Tennessee statutes here, the Tennessee Court of Criminal Appeals and [Tennessee] Supreme Court having already held that the legislature intended cumulative punishments").[1] "[T]he fact that the state court's interpretation of state law happens to be central

---

[1]Jones points to language in *Banner* limiting its relevance when the state courts "failed to give a clear expression on the issue of cumulative punishment." *Banner*, 886 F.2d at 782. *Banner* used that language to distinguish *Pryor v. Rose*, 724 F.2d 525 (6th Cir. 1984) (en banc), an opinion

to the double jeopardy analysis does not permit us to review the [Michigan] Court of Appeals' construction of [its own] law." *McCloud*, 409 F.3d at 875. It does not matter, as Jones argues, that the state appellate decision was not precedential or that only a state's supreme court can issue a binding interpretation of state law. The state court's decision of state law is not cognizable on habeas review.

Jones cites *Brown v. Ohio*, 432 U.S. 161 (1977), as an example of the Supreme Court reviewing the state court's reasoning on a double jeopardy claim. In that case, the Court said that it "agree[d] with the Ohio Court of Appeals that joyriding and auto theft, as defined by the [state] court, constitute the same statutory offense within the meaning of the Double Jeopardy Clause." *Id.* at 168. Put differently, the Court agreed that, *given* the lack of legislative authorization for multiple punishments, the convictions in *Brown* violated the Double Jeopardy Clause. A multiple-punishments challenge takes root only if the legislature did not authorize multiple punishments. When it has, there is no federal issue with which a federal court can agree or disagree. *See Banner*, 886 F.2d at 782 (rejecting the reading of *Brown* advocated by Jones).

In this case, we must accept the Michigan Court of Appeals' construction of the Michigan statutes: the murder statute "protect[s] human life and prohibit[s] wrongful slayings"; the conspiracy statute "protect[s] society from the increased danger presented by group activity"; and the solicitation

---

that did not make clear how—or whether—the state court had decided the double-jeopardy question. *Banner*, 886 F.2d at 782 & n.2. The *Banner* panel resolved the confusion by holding that we must defer to state-court holdings when the state "courts have carefully considered and analyzed the scope of the [state] statutes." *Id.* at 782. The Michigan Court of Appeals did so in this case, and we are bound by *Banner*.

statute "pr[o]scribe[s] the inducement of another to commit an offense." *Jones*, 2005 WL 657578, at \*5. A federal court reviewing a habeas petition may not, as Jones requests, reexamine the role of Michigan's rule of lenity, the level of generality at which to examine the purpose of each statute, or whether Michigan's legislature intended to punish a single act of procurement under three statutes. Given the distinct purposes of the statutes of conviction, there is no colorable argument that the Double Jeopardy Clause protects Jones from being convicted under all three statutes.

## D. Sufficiency of the Evidence

Under AEDPA, challenges to the sufficiency of the evidence used to convict a petitioner must survive "two layers of deference to groups who might view facts differently than we would." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1081 (2010).

> First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt. In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable.

*Id.* (citations omitted). Jones challenges each of his three convictions, but he disputes the sufficiency of the evidence only as to (1) his intent and (2) his performance of acts that assisted in or his encouragement of the murder. Sufficient evidence supports both elements.

One element of second-degree murder is the "intent to kill, . . . inflict great bodily harm, or . . . create a very high risk of death with the knowledge that the act probably will cause death or great bodily harm." *People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996). Under an aiding-and-abetting theory of liability, the intent component is satisfied by, among other options, proof that "the defendant intended the commission of the crime." *People v. Robinson*, 715 N.W.2d 44, 47–48 (Mich. 2006) (internal quotation and alteration marks removed). "[I]nten[t] that a murder would in fact be committed" is also an element of solicitation to commit murder. *People v. Crawford*, 591 N.W.2d 669, 673 (Mich. Ct. App. 1998). Similarly, conspiracy requires specific intent "to combine with others" and "to accomplish the illegal objective." *People v. Carter*, 330 N.W.2d 314, 319 (Mich. 1982), *overruled in part on other grounds*, *People v. Robideau*, 55 N.W.2d 592 (Mich. 1984). In this case, a jury could reasonably find that Jones intended to have the victim killed and intended to make an agreement to kill the victim. Adams and Emma Flowers both testified that, based on the statement that they overheard Trice make, Jones was arranging to have the victim killed. Jones's statements to Trice—that "[t]he order had been taken care of," that he had "paid the n-----," and, when asked "whether he had anything to do with" the victim's death, he responded "[w]hat you thought," R. 17 (06/17/03 Trial Tr., Trice at 40, 42–45)—could be interpreted as evidence of intent. The liquor-store conflict and Trice's difficulties with the victim also supply limited circumstantial support. Resolving factual disputes in favor of the prosecution, we cannot conclude that it was unreasonable for the Michigan Court of Appeals to determine that a rational trier of fact could find that Jones had intended to kill Flowers.

For similar reasons, the Michigan Court of Appeals was not unreasonable in finding that Jones performed acts or gave encouragement to the shooter, as is required under an aiding-and-abetting theory, *Robinson*, 715 N.W.2d at 47–48, and that Jones made an agreement to commit murder, which is required for a conspiracy conviction, *Carter*, 330 N.W.2d at 319. Trice testified that Jones told her that he had paid someone and "taken care of" the "order." R. 17 (06/17/03 Trial Tr., Trice at 40). Her testimony provides a sufficient basis for the Michigan Court of Appeals to have found that a reasonable jury could have convicted Jones.

### III. CONCLUSION

For the reasons explained above, we **AFFIRM** the district court's denial of habeas relief.